*An appropriate order will be entered.*

JOHN S. BOLLES AND MARY P. BOLLES, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 869–76.     Filed November 30, 1977.

*Peter S. Buchanan* and *Jeffrey G. Wagner*, for the petitioners.
*William E. Saul*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1969 in the amount of $107,147. There are two issues presented for our decision: (1) A determination of the fair market value of a package of securities received by petitioners on August 7, 1969; and (2) whether certain contract rights which petitioners received on August 7, 1969, had an ascertainable fair market value and, if so, a determination of such fair market value.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners John S. and Mary P. Bolles, husband and wife, resided in San Francisco, Calif., at the time they filed the petition herein. Petitioners filed a joint Federal income tax return for 1969 with the District Director, Internal Revenue Service, San Francisco, Calif.

Mary P. Bolles is the daughter of William T. Piper, Sr. Prior to May 8, 1969, petitioners owned 22,759 shares of common stock of the Piper Aircraft Corp. (Piper). Petitioners held 195 of these in joint tenancy with the remaining 22,564 shares being the separate property of petitioner Mary P. Bolles.

On December 30, 1968, Chris-Craft Industries, Inc. (CCI), purchased its first shares of Piper. At such time Piper had 1,641,890 shares issued and outstanding. These shares were traded on the New York Stock Exchange (NYSE) from October 1, 1968, to August 11, 1969 (except for a suspension of trading from April 7, 1969, to April 18, 1969), and then on the Philadelphia-Baltimore-Washington Stock Exchange (PBWSE).

Between January 3, 1969, and January 22, 1969, CCI purchased an additional 198,500 shares of Piper common stock. CCI informed Piper on January 23, 1969, that it would be announcing that day a cash tender offer for the purchase of Piper's stock and that CCI had tentative plans to acquire a majority of Piper's stock. On that same day, a CCI press release announced a cash tender offer beginning immediately and ending on February 3, 1969, for up to 300,000 shares of Piper common.

The Piper board of directors adopted on January 25, 1969, a resolution that CCI's offer was not in the best interests of the Piper shareholders and it sent out letters that day to the Piper shareholders requesting that they delay accepting the CCI offer pending Piper's response. On January 27, 1969, Piper sent a letter, signed by W. T. Piper, Jr., to its stockholders recommending rejection of the CCI offer.

By February 3, 1969, CCI owned 541,906 Piper shares which represented approximately 33 percent of the outstanding Piper shares. On February 27, 1969, CCI filed with the SEC an S-1 registration statement and a preliminary prospectus for an exchange offer to acquire at least 80,000 and up to 300,000 Piper shares. At the annual meeting of Piper shareholders on March

25, 1969, CCI elected two members to the eight-member board of directors.

At its April 1, 1969, meeting, the Bangor Punta Corp. (BPC) considered disposing of the Bangor and Aroostock Railroad (BAR), and its board appointed a committee headed by Curtis Hutchins to study various methods of disposition. Hutchins later met with Frederic Dumaine, chairman of the board of Amoskeag, Inc., to discuss the possible sale of the BAR to Amoskeag. On May 12, 1969, Dumaine offered $5 million for the BAR and he indicated no preference for buying assets or stock at that time but on May 15 he decided to buy stock. Hutchins' committee agreed that a sale to Dumaine at $5 million would be BPC's best course of action and Hutchins reported Dumaine's offer and his committee's recommendation at a BPC board meeting on May 21, at which time Nicholas M. Salgo, BPC's chairman, suggested selling 51 percent of the BAR then and 49 percent later for a total consideration of $7 million. Such proposal was rejected by Dumaine and on May 27 he and Hutchins formulated a letter of understanding, which was not signed by Hutchins, stating "you [Dumaine] and I have agreed * * * on the sale" at $5 million, but with the qualification that any understanding was subject to the BPC board approval. On June 16, Hutchins informed Dumaine that the BPC board had refused to approve the letter of understanding and that the BPC management considered it essential that the legal and accounting effects of the transaction be studied. While he explained that such investigations probably could not be completed for another 2 months, Hutchins expressed to Dumaine his personal opinion that a deal would be made.

On May 7, 1969, CCI announced a new exchange offer which increased the value of the package offered on February 27, 1969, by $10. The February 27, 1969, offer was withdrawn when the new offer became effective on July 24, 1969. Such new offer was terminated on August 4, 1969, at which time CCI held 668,298 shares or 41 percent of Piper's outstanding shares. CCI made additional purchases of 29,200 shares between August 12 and August 18, 1969, and then withdrew from the contest for Piper.

On May 8, 1969, petitioners, together with 41 other holders of Piper common stock who were related members of the Piper family and Piper family trusts, entered into an agreement for

the sale or exchange of the 501,090 Piper shares which they held to BPC. The May 8, 1969, agreement provided in part as follows:

*Section 1. Escrow.* * * *

(B) * * * William T. Piper, Jr. * * * is hereby * * * designated the Agent ("the Agent") for the Sellers [Piper family shareholders including petitioners] as to all matters and controversies relating to this Agreement * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

*Section 2. Exchange Offer.* (A) Bangor Punta will as soon as practicable submit to a meeting of its shareholders a proposal for, and an unqualified recommendation of approval of, an exchange offer ("the Exchange Offer") as hereinafter described and will use its best efforts to obtain the necessary shareholder and governmental approval therefor. The Exchange Offer will be for all outstanding shares of Piper Common Stock owned by Sellers at the time of the Exchange Offer. If Bangor Punta's shareholders disapprove such proposal, this Agreement and the Escrow shall forthwith terminate without further action by Bangor Punta or Sellers.

(B) Under the Exchange Offer each share of Piper Common Stock will be exchanged for (i) one share of Bangor Punta Common Stock, par value $1 per share, as constituted on the date hereof, (ii) Bangor Punta Warrants—Series C, expiring March 31, 1981, to purchase 2.2 shares of Bangor Punta Common Stock as constituted on the date hereof, and (iii) $15 principal amount of a new Bangor Punta 5½% 25-year Convertible Subordinated Debenture, convertible into Bangor Punta Common stock as constituted on the date hereof at a conversion price of $55 per share (and having other privileges and protections, such as against dilution, that are customary in publicly offered convertible debt securities).

(C) Sellers will cooperate with Bangor Punta in making the Exchange Offer and obtaining any governmental approval appropriate in connection with the making of the Exchange Offer and in connection with the issuance of the Bangor Punta securities issuable as part of such offer. Sellers understand that some, or all, of them may be deemed underwriters within the meaning of the Securities Act of 1933 in connection with the Exchange Offer, and Sellers will have the rights customarily accorded to underwriters for legal protection in respect of material to be included in any Registration Statement filed in connection with the Exchange Offer and will comply with all applicable requirements of federal and state securities acts in connection with any distribution by them. * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

(E) Beginning on the date hereof Bangor Punta will use its best efforts to acquire additional shares of Piper stock ("the Additional Shares") sufficient, when added to the number of shares of Piper Common Stock owned by Sellers and covered by this Agreement, to constitute Bangor Punta the holder of more than 50% of the outstanding shares of Piper stock. As a part of such best efforts, Bangor Punta will take all steps necessary to make a further exchange offer to all holders of Piper Common Stock other than Sellers under which such holders will be entitled to exchange each share of Piper Common Stock held by them for Bangor Punta securities and/or cash having a value, in the written

opinion of The First Boston Corporation, of $80 or more ("the Further Exchange Offer Value"). If Bangor Punta succeeds in acquiring the Additional Shares and if in the written opinion of The First Boston Corporation the value of the Bangor Punta securities delivered under the Exchange Offer for each share of Piper Common Stock (the "Exchange Offer Value"), determined as of the opening date of such Further Exchange Offer, is less than $80, then Bangor Punta will promptly thereafter deliver to Sellers in respect of each share of Piper Common Stock delivered under the Exchange Offer and each share of Piper Common Stock that is purchased by Bangor Punta upon exercise of its rights of first refusal under paragraph (F) of Section 1, Bangor Punta securities and/or cash with a value in the written opinion of The First Boston Corporation equal to the difference between $80 and the Exchange Offer Value.

Under the May 8, 1969, agreement, petitioners had no right to require BPC to amend the registration statement filed with respect to the BPC securities offered therein, nor did they have any right to amend such registration statement or to file their own registration statement.

A press release was made on May 8, 1968, announcing that BPC was acquiring the Piper family's shares through an exchange offer for a package of BPC securities and that BPC would offer to the remaining Piper shareholders a package of BPC securities to be valued in the judgment of the First Boston Corp. at not less than $80 per Piper share. Petitioners received the BPC securities under the May 8, 1969, agreement with the intention of selling all or part of them for purposes of paying the capital gains tax resulting from the exchange.

On May 14, 1969, petitioners entered into an agreement with William T. Piper, Jr., Howard F. Piper, and Thomas F. Piper, as guarantors, which was designed to assure petitioners of having sufficient cash from the sale of their BPC securities in order to pay the tax resulting from the exchange of Piper stock for BPC securities. The May 14, 1969, agreement provided in part as follows:

Subject to the conditions, and upon the terms, below stated, Guarantors guarantee to each member of the Bolles Group that upon the sale of any of such securities in the *principal market therefor* he will receive gross proceeds at least equal to the amount indicated in the opinion of The First Boston Corporation as the fair market value thereof on the exchange date under the Exchange Offer ("Fair Market Value"), provided that such sale takes place prior to April 1, of the year following the year of the exchange date. * * * [Emphasis supplied.]

Such guarantee applied only to the sale by petitioners of a

specified portion of the BPC securities received by them under the May 8, 1969, agreement. For purposes of the May 14, 1969, agreement, the First Boston Corp. valued the package of BPC securities as of August 7, 1969, as follows:

| Securities | Valuation per unit | Total |
|---|---|---|
| 1 Common share | $22.625 | $22.625 |
| Warrants to purchase 2.2 common shares | 6.00 | 13.20 |
| $15 Principal amount 8¼-percent convertible subordinated debentures | 85% | 12.75 |

CCI brought suit on May 22, 1969, against BPC, Piper, and the First Boston Corp. to enjoin the BPC exchange offer and collect $45 million in damages. In another proceeding, on May 13, 1969, the two CCI directors on the Piper board were given access to a list of Piper shareholders.

The SEC brought an action against Piper and BPC on May 26, 1969, charging that the May 8 press release violated the Securities Act of 1933, and both defendants consented to a permanent injunction without admitting any of the allegations of the complaint.

BPC filed an S–1 registration statement on May 29, 1969, for both the "limited exchange offer" to the Piper family pursuant to the May 8, 1969, agreement and the general exchange offer to the general public and filed a preliminary prospectus for the "general exchange offer." While awaiting SEC action on the exchange offer, BPC negotiated purchases of a total of 120,200 shares of Piper common in private transactions.

BPC brought suit on June 2, 1969, to enjoin CCI from accepting Piper common stock, to keep CCI from voting Piper shares, to make CCI divest itself of Piper shares, and to make CCI pay $50 million in damages. On July 1, 1969, Piper brought an action to have the two CCI elected directors removed from its board.

On June 4, 1969, Piper sent a letter, signed by William T. Piper, Jr., to all of its shareholders urging them to read and study carefully the preliminary prospectus on the BPC exchange offer, and on June 20, 1969, Piper sent a letter to its shareholders

criticizing the CCI exchange offer and suggesting that it was not in the best interests of the shareholders.

BPC's general exchange offer became effective on July 18, 1969. Such offer consisted of 1 share of Piper common exchanged for 1.2 shares of BPC common, warrants for 3.5 shares of BPC common and $31 principal amount of new 8¼-percent convertible subordinate debentures, due 1994, convertible at $55. The First Boston Corp. sent to BPC an opinion letter, dated the same date, valuing such combination of BPC securities at not less than $80 per Piper share.

On July 22, 1969, CCI brought suit seeking a preliminary injunction which would order BPC (1) to offer the right to rescind to all persons who had tendered Piper shares to BPC pursuant to its exchange offer; (2) to refrain from acquiring further Piper shares; (3) to refrain from effecting a merger of Piper and BPC; and (4) to refrain from voting the 120,200 Piper shares acquired for cash between May 16 and May 23, 1969.

BPC's shareholders approved the limited exchange offer with the Piper family on August 7, 1969, so that the offer became effective on such date and the Piper family received, in addition to contractual rights under section 2(E), of the May 8, 1969, agreement, the following BPC securities:

> 1,102,398 warrants representing 56.7 percent
> of the outstanding warrants

> 501,090 shares of common stock representing
> 12.9 percent of the outstanding common stock

> $7,506,350 principal amount of debentures
> representing 68.6 percent of the outstanding
> debentures

By September 5, 1969, BPC had acquired record ownership of 839,306 shares or 51 percent of the outstanding Piper common stock. In October 1969, demands were made upon BPC for the additional consideration provided for under section 2(E) of the May 8, 1969, agreement, but such demands were rejected.

BPC entered into an agreement on October 2, 1969, to sell the BAR to Amoskeag for $5 million, sustaining a $13.8-million book loss on such sale.

On September 7, 1970, the SEC brought an action alleging

that the prospectus for BPC's July 1969 general exchange offer to the public had violated section 14(e) of the Securities Exchange Act of 1934 by failing to disclose an alleged agreement to sell BPC's investment in the BAR. In such action, the court ruled on November 17, 1971, that the failure to disclose the obsolete nature of the amount at which the BAR investment was carried on BPC's books was of such materiality as to require BPC to offer the Piper shareholders who accepted the general exchange offer an opportunity to rescind.

On November 18, 1969, petitioners sold 800 BPC warrants for $4,794.85, or approximately $6 per warrant. On December 30, 1969, petitioners sold 2,271 shares of BPC common for $32,755.58, or approximately $14.42 per share.

On July 30, 1970, petitioner Mary P. Bolles brought an action against BPC for declaratory relief alleging that BPC had acquired the requisite number of Piper shares and, therefore, was liable for payment of the additional consideration provided for in section 2(E) of the May 8, 1969, agreement. In such action, BPC took the position that it was not liable for payment of such additional consideration until it had unchallenged full legal title to more than 50 percent of the outstanding Piper shares. On March 19, 1976, a settlement agreement was executed by BPC, by petitioner Mary Bolles, and by other members of the Piper family, under which the Piper family members would receive, as additional consideration under section 2(E) of the May 1969, agreement, $3.5746 in cash, $5.3619 in notes, and 0.2979 shares of BPC common stock for each share of Piper common that they had exchanged on August 7, 1969.

On January 31, 1973, the SEC staff issued a "no action letter" approving sale of the Piper family's BPC securities in accordance with Rule 144, 17 C.F.R. sec. 230.144 (1976). Such letter read in part as follows:

On the basis of the facts presented, it is the staff's opinion that the combined members of the Piper family would appear to form a control group, and, hence, individually, would be "affiliates" of the Company within the meaning of Rule 144(a)(1) enabling them to effect resales in the Company's securities pursuant to Rule 144. * * *

BPC was a conglomerate and the market price of conglomerates, in general, entered a period of steep decline in 1969. In particular, the market price of BPC common stock declined sharply during 1969, commencing the year at 44½, it dropped to

22⅝ on August 7, 1969, and reached a low of 5½ in August 1970. BPC's earnings per share flattened during 1968 and declined during 1969. BPC incurred a loss in the final quarter of fiscal 1969 (July 1, 1969, through September 30, 1969). The price volatility of conglomerates in general was substantially higher than the price volatility of the general industrials in 1969, and BPC's price volatility during that period was even greater than the price volatility of conglomerates in general.

Investment companies often purchase securities which are subject to resale restrictions at an average cost discount of 38 percent for common and convertible preferred stock, 22 percent for convertible debentures, and 67 percent for warrants.

The market prices,[1] as of August 7, 1969, of the BPC securities received by the Piper family under the May 8, 1969, agreement were as follows:

|  | Total |
|---|---|
| 1 share of BPC common | $22.625 |
| Warrants for 2.2 BPC common at $55 | 14.300 |
| $15 principal amount of 8¼-percent debentures | 12.600 |
| Total | 49.525 |

In his statutory notice, respondent valued the package of BPC securities and contract rights which petitioners received under the May 8, 1969, agreement as follows:

|  |  |
|---|---|
| 1 share BPC common | $15.00 |
| Warrants for 2.2 BPC common at $55 | 6.50 |
| $15 principal amount of 8¼-percent debentures | 12.00 |
| Rights under sec. 2(E) of May 8, 1969, agreement | 12.00 |
| Total value of package | 45.50 |

---

[1] All prices are as quoted in the Wall Street Journal except those for the debentures which are the earliest quotations in National Bond Summary.

OPINION

In this case we are faced with the problem of valuing, for purposes of section 1001,[2] certain common stock, warrants, and convertible debentures which petitioners received from BPC in return for their Piper common stock. We must also decide if the contract rights accorded to petitioners under section 2(E) of the May 8, 1969, agreement had an ascertainable fair market value during 1969 and, if so, we must determine it.

We first turn to the valuation of the BPC securities. The parties agree that the stock market quotations of the BPC common stock and warrants should be discounted for the blockage factor and the overvaluation of the BAR assets on BPC's books, a fact which would have come to light prior to sale by private placement of a large block of securities such as petitioners'. Petitioners, however, contend that an additional discount should be allowed because, as of August 7, 1969, their stock was subject to restrictions on transferability pursuant to the Securities Act of 1933 (1933 Act) and further that respondent's valuation expert should have considered, but did not consider, the effect of these restrictions when valuing their BPC securities. We agree with petitioners.

In *Hirsch v. Commissioner*, 51 T.C. 121, 135 (1968), we held that the value of Hirsch's shares was significantly affected by the possibility that a sale of his shares, other than by a private or intrastate offering at any time during the period in issue, would have been in violation of the 1933 Act. In *Hirsch*, the taxpayer had twice attempted from January 2, 1962, to July 27, 1965, to obtain a favorable ruling from the SEC but had been refused, and the SEC reply of February 1, 1962, specifically stated that a sale by Hirsch of his shares would be in violation of the 1933 Act. We stated (51 T.C. at 135):

---

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

Since neither Ira's circumstances nor the Securities Act of 1933 changed materially if at all from July 3, 1961, the date he exercised the options, to February 1, 1962, or thereafter, we conclude that the SEC would have issued a similar ruling if the request had been made on July 3, 1961, when the option was first exercised.

Even if we were to assume that a sale of Ira's shares would not have violated the 1933 Act, the SEC's position that it would consider any sale without prior registration as a violation is a restriction which has a significant effect on the value of the stock.

The facts in the instant case are similar to those of *Hirsch*. On January 31, 1973, the SEC staff issued a "no action letter" allowing sale in accordance with rule 144, 17 C.F.R. sec. 230.144 (1976).[3] Such letter stated that the Piper family "would appear to form a control group." Neither petitioners' nor the Piper family's relationship to BPC or to one another changed materially nor did the 1933 Act change materially between August 7, 1969, and January 31, 1973. Consequently, we conclude that the SEC would have issued a similar ruling that the Piper family formed a control group of BPC if a similar request had been made on August 7, 1969.

The ways in which petitioners, as members of a control group, could sell their stock without violating the 1933 Act were limited. If petitioners sold to a person who took with a view to distribution then such person would be considered an "underwriter" under section 2(11)[4] of the 1933 Act (15 U.S.C. sec. 77(b)(11)) and the section 4(1) exemption of the 1933 Act for "transactions by any person other than an issuer, underwriter, or dealer" (15 U.S.C. sec. 77(d)(1)) would be lost. I L. Loss, Securities Regulation 665–666 (2d ed. 1961). Therefore, petitioners could have sold their BPC securities without violating the

---

[3]Rule 144, 17 C.F.R. sec. 230.144 (1976), was not adopted until 1972, but the concept of "control" was unchanged by its adoption.

[4](11) The term "underwriter" means *any person who has purchased from an issuer with a view to,* or offers or sells for an issuer in connection with, *the distribution of any security,* or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term *"issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer,* or any person under direct or indirect common control with the issuer. [Emphasis supplied.]

1933 Act only by a registered offering or a sale to private persons who took for investment.[5]

The BPC securities which petitioners received on August 7, 1969, were registered in July 1969, but petitioners had no right to amend such registration statement or to require BPC to amend it in order to keep it current. The registration statement relating to the BPC securities was later found to contain a material misrepresentation as to a matter which had to be contained in the prospectus under section 10(a)(1) of the 1933 Act (15 U.S.C. sec. 77(j)(a)(1)) until such registration statement was amended to correct such material misrepresentation. I L. Loss, Securities Regulation 293–294 (2d ed. 1961). Therefore, any sales made by means of such prospectus could possibly have been rescinded by the buyer. 15 U.S.C. sec. 77(1)(2).

The price at which property changes hands in a transaction which is subject to rescission by the buyer is not indicative of its fair market value.[6] Therefore, we conclude that petitioners could have sold their BPC securities without violating the 1933 Act only by a sale to persons who took for investment.

A buyer who took petitioners' BPC securities for investment would take those securities subject to restrictions on their transfer:

The concept of taking for investment does not impose an indefinite restraint on alienation. Of course, a distribution within a relatively short period after acquisition would be evidence of an original intent to distribute. And a

---

[5] The leakage provisions of rule 154, 17 C.F.R. sec. 230.154 (1971) (removed in 1972 upon adoption of rule 144, *supra*), would not apply to sales by petitioners *if they themselves were underwriters*. Sec. Act. Rel. No. 4818 (Jan. 21, 1966); IV L. Loss, Securities Regulation 2669 (Supp. 1969). A public sale of their stock shortly after Aug. 7, 1969, together with the May 14, 1969 Agreement, evidencing petitioners' intent to sell their BPC securities in order to pay the taxes resulting from the exchange, would certainly establish that petitioners took "with a view to * * * distribution" so that they would be underwriters. 15 U.S.C. sec. 77(b)(11); I L. Loss, Securities Regulation 666 (2d ed. 1961). Therefore, we have not considered the possibility of a sale under such leakage provisions in our valuation, nor did petitioners' or respondent's expert witnesses.

The parties agree that the exemptions under sec. 3 of the Securities Act of 1933 (15 U.S.C. sec. 77(c)) as well as the exemptions under sec. 4(3) and (4) of the 1933 Act (15 U.S.C. sec. 77(d)(3) and (4)) do not apply.

[6] For this same reason, respondent's arguments (1) that the securities law restrictions are irrelevant because petitioners were not aware of them on Aug. 7, 1969, and (2) that the price which petitioners received upon the sale of a very small amount of BPC warrants and common stock in late 1969, when the parties were not aware of the securities law restrictions, is indicative of their fair market, are without merit. Moreover, we believe that the securities law restrictions would have been discovered by the potential buyer if petitioners had attempted the sale of their entire block (or of any substantial portion) of BPC securities so that any sale in which a willing buyer and a willing seller had "reasonable knowledge of the relevant facts" would be one in which they had knowledge of such restrictions. Sec. 1.170A–1(c)(2), Income Tax Regs.

preconceived intention to distribute at a determinable time is inconsistent with the concept of buying for investment. [I L. Loss, Securities Regulation 552 (2d ed. 1961).]

The value of stock which may be sold only to persons who take for investment is significantly decreased by such restriction. *Le Vant v. Commissioner*, 376 F.2d 434 (7th Cir. 1967); *Hirsch v. Commissioner, supra* at 135–136; *Husted v. Commissioner*, 47 T.C. 664, 678–679 (1967).

Although respondent's expert considered that petitioners' stock would have to be privately placed, he did not consider the significant fact that any purchaser of such stock would take it subject to restrictions on its transferability. Therefore, the values which respondent's expert has assigned to petitioners' BPC securities bear little weight.

Petitioners introduced credible evidence that the average discount for restricted securities was 38 percent for common stock and convertible preferred stock, 22 percent for convertible debentures, and 67 percent for warrants. Respondent incorrectly insisted that the securities law restrictions were irrelevant so that he offered no evidence of the proper discount for such restrictions.

In the case of the debentures, petitioners' expert believed that a greater discount than the average for restricted convertible debentures would be required to induce a purchase of them because of the nature of the restrictions, the size of the holding, and the fact that professional investors capable of absorbing such a large offering would have been primarily interested in capital growth rather than current income. However, we believe that all of these factors are likely to be present in the average transactions in which a 22-percent discount is required. We note that respondent's expert, while allowing substantial discounts from the market price of the BPC common stock and warrants because of the blockage factor, overvaluation of the BAR assets, and uncertainty stemming from BPC's takeover attempt of Piper, allowed only a nominal discount, representing handling costs, from the market price of the debenture. We find that the market value of the debenture which petitioners received in exchange for one share of Piper common is $9.83.[7]

---

[7]Respondent argues that the fair market value of that portion of petitioners' BPC securities, which were guaranteed to sell under the May 14, 1967, agreement at a price equaling their fair market value on Aug. 7, 1969, as determined by the First Boston Corp., is equal to the guaranteed price. We note

Petitioners' expert believed that a discount greater than the average from the market price of unrestricted BPC common stock would be required in order to sell petitioners' BPC common stock because there was evidence that BPC's profits were declining, the market popularity of shares in conglomerates was waning, petitioners' block of shares was large, and there had already been a substantial reduction in the market price of BPC common shares which made them a less attractive vehicle with which to pursue a conglomerate's acquisition program. In addition, we note that the market price of the BPC common stock was more volatile than the average stock, that restrictions against resale fully expose the holder to the risk of a price decline, and that the outlook for BPC was not bright. We believe that such factors justify a larger discount from market price for BPC common than the average discount, and we find that the fair market value, as of August 7, 1969, of the BPC common stock which petitioners received in exchange for 1 share of Piper common is $12.44.

Petitioners' expert believed that their BPC warrants would have to be discounted by more than the average discount from the market price of unrestricted BPC warrants in order to induce a purchase because the exercise price of the warrants (55) was well above the market price of BPC common stock (22⅝), the outlook for BPC was not bright, and market interest in BPC, and conglomerates as a group, was waning. We believe that such factors do require a greater than average discount for the BPC warrants and we find that the value of the warrants which petitioners received in exchange for 1 share of Piper common is $1.43.

We now turn to the question of whether petitioners' rights under section 2(E) of the May 8, 1969, agreement had an ascertainable value during 1969. Under section 2(E) of the May

---

first that since the First Boston Corp. valued the BPC securities for purposes of the May 14, 1969, agreement at their market prices, it is obvious that the restrictions arising under the 1933 Act were not considered. Therefore, such valuation would have little weight as evidence of fair market value of petitioners' BPC securities on Aug. 7, 1967, were it not for its integral relationship to the May 14, 1969, agreement. However, petitioners never received any payment under the May 14, 1969, agreement and we seriously doubt that such guarantee was enforceable pursuant to the valuation made by the First Boston Corp., since such valuation omitted a material factor and since petitioners' BPC securities were restricted and therefore could not be sold in the requisite "principal market therefor" as the First Boston Corp. had interpreted that term for purposes of its valuation.

8, 1969, agreement petitioners were entitled to additional consideration for their exchanged Piper shares only if BPC succeeded in "acquiring" more than 50 percent of the Piper outstanding shares. Such additional consideration was to be computed as the difference between $80 and the value, in the written opinion of the First Boston Corp., of the BPC securities received by petitioners on August 7, 1969, and it was to be paid in cash and/or BPC securities as valued by the First Boston Corp.

On July 22, 1969, before BPC had acquired 50 percent of the Piper stock, CCI brought suit seeking a preliminary injunction ordering BPC to offer the right to rescind to all persons who had tendered Piper shares to BPC, to refrain from acquiring more Piper shares, to refrain from effecting a merger of Piper and BPC, and to refrain from voting the 120,000 Piper shares acquired for cash between May 16, 1969, and May 23, 1969. Such preliminary injunction was denied but CCI sought and received an expedited appeal to the Second Circuit Court of Appeals and the right of BPC in such stock was not resolved during 1969. BPC had not acquired more than 50 percent of the outstanding Piper stock by August 7, 1969. These facts led respondent's expert to state in his valuation report that the future of petitioners' right to the additional consideration as of August 7, 1969, "was predicated on contingencies and shrouded in uncertainty," and that the present value of their right to such additional consideration was "hardly a toss-up, hardly a 50–50 gamble on the exchange date." Moreover, payment of the additional consideration was to be made in cash and/or securities which were to be valued by the First Boston Corp., but the date of valuation was not specified so that the actual amount of consideration which petitioners would eventually receive, as well as their right to any consideration at all, was subject to contingencies during 1969. Petitioners' demands for payment which were made in October 1969 were rejected. Therefore, we conclude that petitioners' right to additional consideration under section 2(E) of the May 8, 1969, agreement was "wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty" during 1969 so that such right had no ascertainable fair market value during 1969 and petitioner need not recognize any gain for the taxable year 1969 from receipt of rights under section 2(E) of the May 8, 1969,

agreement. *Burnet v. Logan,* 283 U.S. 404 (1931); *In re Steen,* 509 F.2d 1398, 1403 (9th Cir. 1975).

Petitioners' request for an award of reasonable attorneys' fees must be denied in accordance with *Key Buick Co. v. Commissioner,* 68 T.C. 178 (1977).

*Decision will be entered under Rule 155.*