ESTATE OF FREDERICK P. STRATTON, DECEASED, FREDERICK P. STRATTON, JR., AND JOHN T. HARRINGTON, PERSONAL REPRESENTATIVES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Stratton v. Commissioner
Docket No. 5986-80
United States Tax Court
T.C. Memo 1982-744; 1982 Tax Ct. Memo LEXIS 2; 45 T.C.M. (CCH) 432; T.C.M. (RIA) 82744; December 30, 1982. *2 Thomas J. Donnelly and Theodore F. Zimmer, for the petitioners. Joseph R. Peters, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge:* Respondent determined a deficiency in estate tax of $148,428.28. By amendment to petition, petitioner alleged that the value of certain stock as reported in the estate tax return was overstated and on that basis claimed an overpayment. The issue for decision is the value at the date of Frederick P. Stratton's death of 211,973 shares of the common stock of Briggs & Stratton Corporation. FINDINGS OF FACT Frederick P. Stratton (decedent) died on June 1, 1976. Frederick P. Stratton, Jr., and John T. Harrington are the personal representatives of his estate. Each of them was a resident at the date on which the petition in this case was filed of Milwaukee, Wisconsin. An estate tax return for decedent's estate was filed with the Internal Revenue Service at Milwaukee, Wisconsin, on March 1, 1977. At the date of his death, decedent owned *3 260,848 shares of stock of Briggs & Stratton Corporation (B & S) after giving effect to a 2-for-1 stock split payable to shareholders of record on May 28, 1976, which was paid on June 25, 1976. The B & S stock at all times relevant to this case was listed and traded on the New York Stock Exchange (Exchange). On June 1, 1976, the mean price between the high and low quoted prices for B & S stock on the Exchange was $27.65625 per share. On June 1, 1976, B & S had issued and outstanding 14,463,808 shares of common stock adjusted for the stock split. At the date of his death, decedent was chairman of the board of B & S. His son, Frederick P. Stratton, Jr., is a director and member of the executive committee of B & S, and at the time of the trial of this case was its president. All of the B & S stock owned by decedent at the date of his death is subject to Federal security laws restrictions on sale and transfer. Because of the status of decedent and his estate and of the B & S shares held by the estate, the estate could have sold, during any 6-month period, a number of B & S shares equal to the average weekly trading volume in B & S stock on the Exchange during the previous 4-week *4 period. Sales pursuant to Security and Exchange Commission (SEC) Rule 144 would have permitted the estate to sell B & S shares on the Exchange only pursuant to unsolicited brokerage transactions and provided that adequate market information was available to the investing public. The use of SEC Rule 144 to effect sales of restricted stock requires the filing of Form 144 with the SEC as evidence of the transaction. The average weekly trading volume of B & S stock on the Exchange for the 4 weeks preceding June 1, 1976, was 32,100 shares. The average weekly trading volume of B & S stock for the 4-week period preceding the week beginning July 26, 1976, was 48,875 shares. When trading volume increases during a 6-month period, additional sales under SEC Rule 144 may be permitted based on increased volume. As a result of an increase in the trading volume following the date of decedent's death, the estate sold 42,000 shares of B & S stock on the Exchange in the period from the date of decedent's death to December 17, 1976, at prices ranging from $28 to $32 per share. The estate sold an additional 12,000 shares of B & S stock on the Exchange during April, May and August, 1978, also pursuant *5 to SEC Rule 144, at prices ranging from $29 to $31.25 per share.An additional 14,501 shares have been sold in private transactions to family members of the Stratton family at the mean of the high and the low Exchange quoted price on the date of the sale. Such sales were made based upon standard investment representations common in private placement transactions. [1]
*6 Neither decedent nor his estate had any agreement with B & S and the estate has never acquired a right of any kind to have the restricted B & S shares held by the estate be the subject of a registration statement by B & S, which would allow a public distribution of the restricted shares. Since June 1, 1976, and for 12 years prior thereto, there has been no registration of B & S shares of any kind. In March 1964, B & S agreed to and did register with the SEC for sale in a secondary underwritten offering 66,500 shares of its common stock for the benefit of the estate of Elizabeth Stratton McGregor, who died on March 13, 1964. Mrs. McGregor's husband, Armin S. McGregor, was the personal representative of Mrs. McGregor's estate. The shares held by Mrs. McGregor's estate represented approximately 1.8 percent of the outstanding shares of B & S at the time of Mrs. McGregor's death. Neither Mrs. McGregor nor any personal representative of her estate was affiliated as an officer or director with B & S. At the time of Mrs. McGregor's death, the estate faced an acute cash shortage, chiefly caused by death tax requirements, and had a compelling need to sell B & S stock. The representatives *7 of Mrs. McGregor's estate attempted to obtain an SEC ruling that registration was not necessary prior to sale, but such a ruling was refused to the estate by the SEC. The initial registration statement with respect to the stock held by Mrs. McGregor's estate was filed with the SEC on February 25, 1964. On February 24, 1964, B & S traded 1,900 shares on the Exchange and the price range was 42-3/4 high, 42-1/2 low and 42-3/4 close. On March 11, 1964, the amended registration statement incorporating the SEC's comments was filed. On that date, B & S traded 1,200 shares on the Exchange with a price range of 42-1/4 high, 41-1/4 low and 41-1/2 close. The B & S stock price gradually sank pending the secondary offering, notwithstanding the Dow Jones Industrial Average repeatedly hitting new highs. On March 16, 1964, the registration statement became effective at noon, and wires to that effect were sent around the country to the Exchange, to B & S, and to brokers. On that date, the B & S stock price ranged from 41-1/4 high, 40-7/8 low, 40-7/8 close, with 800 shares trading.At the close, the bid was 40-3/4, ask 41-3/8. The secondary offering established by the underwriters on March 16, 1964, was *8 at $41 per share. Prior to the offering date, the underwriters had committed to no specified price which is typical in offerings of this type. The estate of Mrs. McGregor was able to provide a single buyer for 21,000 shares at the price of $41 a share. The high and low on the day the offering became effective was 41-1/2 and 40-7/8, and the mean was $41.1375. Since the $41 price was higher than the market price of 40-7/8, this price required the approval of the board of governors of the Exchange, which was obtained on the basis of the agreement of the single buyer for 21,000 shares to that price. The underwriters' fees, commissions or discount in connection witht the sale of the restricted B & S stock in a registered underwritten public offering of such stock would be approximately 5 percent of the sale price of the stock. The normal brokerage commission for B & S stock in sales on the Exchange on June 1, 1976, would not have exceeded one-half percent of the value of the stock. The costs of flotation of a registered offering of 211,973 shares of the restricted B & S stock in 1976, including revenue stamps, listing fees, underwriters' and directors' indemnity bond, printing and *9 legal and accounting costs, but not including underwriters' discount, would be $185,000. The B & S restricted shares could be registered only if the board of directors agreed to file a registration statement with the SEC. No more than one Stratton served on the nine-man board of directors of B & S at any time relevant to the issue involved in this case. The offices of president and chief executive officer were not held by a Stratton at any time relevant to the issue involved in this case. From the date of decedent's death through 1980, the office of chairman of the board of B & S had not been held by a Stratton. At the date of decedent's death, Frederick P. Stratton, Jr., was neither an officer of B & S nor a member of its board of directors. No other member of the board of directors at the date of Mr. Stratton's death was related to either the decedent or Frederick P. Stratton, Jr. For several years prior to decedent's death, B & S had refused SEC requests that the annual SEC Form 10-K break out separate sales and profit information for its two divisions, one of which was the lock division and the other the engine division. The lock division had four major customers, which *10 were the four largest auto manufacturers. At the time of decedent's death, the Japanese were beginning to enter the engine market for the types of engines manufactured by B & S. B & S operates its business with the use of as small a staff as is feasible for its work. Participation in a registered secondary offering by B & S would have required the assignment to its preparation of personnel who would otherwise have been engaged in other work for B & S. The likely result of a registered secondary offering of 211,973 shares of B & S stock would be to depress the current market price for the stock. The estate did not need to sell any B & S stock in excess of the quantity salable under SEC Rule 144 in order to meet death taxes, debts, administrative expenses or any other expenses of the estate. The estate had other liquid assets. The estate did not need to sell any B & S stock as a matter of fiduciary duty because both decedent's will and a pour-over trust specifically exempted the personal representatives and trustees from the usual diversification rules with respect to the B & S stock. A purchaser of the restricted shares from the estate in a private placement would be required *11 to take those shares for investment and without a view to sale or other distribution. Such a purchaser could not sell the restricted shares on the Exchange for 2 years after purchasing them since the provisions of SEC Rule 144 would be inapplicable to such a purchaser for 2 years. After the 2-year period, the purchaser could only sell the stock on the Exchange in accordance with SEC Rule 144, and could never sell the shares in a registered secondary offering without the agreement and participation of B & S. The price at which petitioner could have sold the 211,973 restricted shares in a private placement without registration rights at the date of decedent's death would have been $20.74 per share. Since some time would be consumed in the preparation of a registration statement, the earliest time at which the restricted B & S shares could have been sold in a registered secondary public offering was from 3 to 6 months following decedent's death. The restricted shares, if they were sold pursuant to a registration statement, would have a diminished value because of the risk inherent in the inability of the estate to sell the shares during this 3-to-6-month period. [2] The closing price *12 of B & S stock on the Exchange on June 1, 1976, was $27.25 a share. On the estate tax return, the estate reported the value of the 260,848 shares as follows: 42,000 shares at $27.65625
$1,161,562.50
218,848 shares at $24.05625
5,264,662.20
The explanation of the method of valuing was that the 42,000 shares which could have been sold under SEC Rule 144 were valued at the mean between the high and low price on the Exchange on June 1, 1976, the date of decedent's death. The following was stated with respect to valuation of the remaining shares: Accordingly, the quoted market price does not accurately reflect the date of death value *13 of the block of Briggs & Stratton Corporation stock consisting of those shares (218,848) which could not be disposed of pursuant to S.E.C. Rule 144. The value of this block is equal to the quoted market price (27.65625) less $3.60, or $24.05625 per share. This valuation is based upon the estimated results of disposing of this block of stock through an underwritten registered offering, which would be the most advantageous method of selling it. Respondent, in his notice of deficiency, increased the reported value of the 260,848 shares of B & S stock by $428,415.87 with the following explanation: It is determined that the fair market value at the date of decedent's death of 47,450 shares of common stock of Briggs & Stratton was $27.65625 per share instead of only 42,000 shares at $27.65625 per share as reported on the estate tax return. Accordingly the value of this stock is increased $150,726.56. It is determined that the fair market value at the date of death of 213,398 shares of the common stock of Briggs & Stratton Corporation was $25.9719 a share instead of $24.65625 a share as reported on the estate tax return. Accordingly, the reported value of this stock is increased *14 $277,689.31. In the petition, petitioner alleged that the valuation in the estate tax return based on a valuation of the stock in registered form was higher than it properly should be and in an amended petition, petitioner alleged that the valuation should be based on a private placement and not a sale through a secondary registration since, under all the factual circumstances present, a secondary registration of the stock could not have been obtained. OPINION Petitioner's primary position is that the facts in this case show that the board of directors of Briggs & Stratton would not have consented to a secondary registration of the stock and, therefore, the stock should be valued at the price it would bring in a private placement sale. Alternatively, petitioner contends that the value of the stock of B & S should be discounted if it were sold in registered form by the registration costs of $185,000, by a risk factor for time delay of 5 percent, by an underwriters' discount of 5 percent and b a discount of 25 cents a share from the closing market price on June, rather than the mean market price. In this manner, they arrived at $23.65225 per share rather than the price of $24.05625 *15 per share used in the return. Respondent's position is that since the most advantageous method of selling the stock was in registered form, the stock should be valued as though it would be sold as registered stock, and that although there would be a flotation cost of the stock and an underwriters' discount, these amounts should be considered as in the nature of selling costs and should not be used to adjust the value of the stock.Respondent also contends that any discounts taken should be from the mean between the high and low price on June 1, 1976, and not from the closing price on that date, and that the risk factor for time delay is overstated by petitioner. Respondent contends there is no basis for the 25 cents a share discount claimed by petitioner. Respondent contends that the value of the 211,973 shares at the date of decedent's death is $26.54842 per share. The first issue to be determined is whether the B & S stock should be valued on the basis of private placement or as if it were sold in registered form pursuant to a secondary registration. Only if we agree with respondent that we should value the stock as if it were sold in registered form do we reach the issues *16 of the proper discount under such circumstances. Frederick P. Stratton, Jr., testified that since there was no necessity for the estate to sell any of the stock to pay taxes or expenses of administration and no necessity to sell the stock for the purposes of diversification, he would have had no basis for requesting a secondary registration and to do so would have violated his duty as a director of B & S responsible to the stockholders as a whole. He further testified that since there was no reason for the estate to sell the B & S stock, in his opinion the board of directors would not have consented to go through with the secondary registration. Two other members of the board of directors who were not related to the Stratton family testified that they, as directors, would not have agreed to a registration of the B & S stock held in the Stratton estate unless the representatives of the estate were able to make a showing that there was a real need in the estate to sell the stock. Both of these witnesses, as well as Mr. Stratton, Jr., pointed out that it would have been very disadvantageous to B & S to have to separately disclose the sales of its lock division and its engine division *17 since such a separation would effectively disclose to its principal lock division customers, the four big auto manufacturers, its profits on locks and would disclose to its Japanese competitors its profits or earnings on engines. The witnesses pointed out that the SEC had been attempting to get B & S to disclose this information on its Form 10-K report filed with SEC and that B & S had been able to successfully resist making this disclosure. They further testified that they would have had to furnish this information in connection with a secondary registration statement. Both of the other directors and Mr. Stratton, Jr., testified tha the time used by the personnel in preparing the registration statement, even though the cost would be borne by the estate, would be disruptive to the ordinary work of B & S and that in their view to sell a block of 211,973 shares of B & S stock in a secondary registration would have depressed the market for B & S stock and, therefore, would have been disadvantageous to other B & S stockholders. However, both of the other directors who testified stated that if Mr. Stratton, Jr., had come to the board and shown a necessity for the estate to sell the B *18 & S stock it held, and in their view the need was real, they would have approved a secondary registration in order to permit the estate to satisfy the real need. From the testimony of the witnesses in this case, we conclude that the board of directors would not have approved a secondary registration of the B & S stock absent any need in the estate to sell such stock. The record shows that because of other liquid assets in the estate and no requirement for diversification of the assets of the estate or the trust in which much of the estate was placed, the estate had no need to sell any of the B & S stock other than that which could be sold under SEC Rule 144. In fact, the parties in this case stipulated that-- The parties agree that petitioner had no need to sell B & S stock in excess of the quantity saleable under SEC Rule 144 to meet death taxes, debts or estate administration expenses, or any other expenses of the estate due to other assets in the estate available for these purposes. The record clearly shows that there was no need for sale of the stock for the purposes of diversification. *19 The question of whether a taxpayer could obtain a registration statement is one of fact which must be determined from the record as a whole. Estate of Piper v. Commissioner,72 T.C. 1062, 1079 (1979). [3] Based on the record in this case, we conclude that it would not have been feasible for the estate to obtain a secondary registration of the B & S stock it held and therefore the proper method of valuing the stock is on the basis of a private placement sale. The value of restricted stock that may be sold only through a private offering to persons who take the stock subject to the same restriction is significantly lower than the value of unrestricted stock. Bolles v. Commissioner,69 T.C. 342, 354 (1977). Petitioner offered the testimony of two expert witnesses as to the fair market value of the stock at the date of decedent's death in a private placement sale. Both of these experts concluded that the valuation of the stock on such a basis would require *20 a 25 percent discount. The only difference in their valuation was whether the 25 percent discount should be applied to the mean between the high and low price of the stock on the Exchange on the date of decedent's death or to the closing price of the stock on the Exchange on that date. If the 25 percent discount is applied to the mean between the high and low price, the resulting value of the 211,973 shares of B & S stock held by the estate on June 1 is $20.74 per share. If the 25 percent discount is applied to the closing price, the value of the 211,973 shares of restricted B & S stock is $20.62527 per share. Petitioner's expert witness, who used the mean between the high and low price to which to apply the discount, testified that in his opinion the 25 percent discount would be necessary in order to sell the 211,973 shares of B & S stock in a private placement and that this 25 percent discount should be applied to the mean price on the Exchange on the date of decedent's death. This witness was a well qualified witness and had prepared and presented to the Court a written report analyzing in detail the reasons for his conclusion. He pointed out that there is always a substantial *21 discount in a private placement of stock which is restricted in the purchaser's hands. However, he stated that the discount is greater in a company the stock of which is sold over the counter than in a company like B & S the stock of which is listed on the Exchange. He pointed out that the discount of restricted shares in smaller companies is higher than in larger companies and gave the results of certain studies made with respect to discounts paid by institutional buyers for restricted shares. In his report he pointed out that B & S was viewed in the investment community in 1976 as a small blue chip company. He stated that for these reasons, B & S stock probably would not sell in a private placement at as great adiscount as stocks of less financially sound corporations. He stated, however, that because of the length of time the potential customer would be required to hold the stock, he considered a 25 percent discount to be necessary in order to sell the stock in a private placement. Viewing the 25 percent discount from the seller's standpoint, this witness concluded that because the return on the B & S stock was not as high as might be received on other investments, had the *22 seller determined that it was advantageous to sell the stock in order to diversify the assets of the estate, a 25 percent discount would seem reasonable to him because of the higher return that might be received on other investments. In our view, this witness is a well qualified appraiser, and his appraisal was based on sound reasoning. Also, normally in determining a discount from the value of stock listed on the Exchange, the value to which the discount is applied is the mean between the high and low price. Therefore, we accept the valuation of the B & S stock on the basis of a private placement as testified to by this expert which is $20.74 per share. Respondent offered no expert testimony with respect to the valuation of the stock on the basis of a private placement and in fact in his cross-examination did not seriously question the valuation of the expert witness on whose testimony we have relied. Because of our conclusion that the 211,973 shares of B & S stock are to be valued on the basis of a private placement sale, we do not reach respondent's contention that the Exchange value of the stock should not be reduced by the agreed 5 percent underwriters' costs and the costs *23 of registration since the items should be considered as selling expenses or the amount of appropriate discount for any other items in a sale of the stock as registered stock. Decision will be entered under Rule 155.
Footnotes
*. By order of the Chief Judge, this case was reassigned from Judge Sheldon V. Ekman, deceased, to Judge Irene F. Scott for disposition.↩
1. The parties agreed for the purpose of this case and in order to settle the issue between them that 48,875 of the shares of B & S stock owned by decedent at the date of his death should be valued at the mean Exchange market price on June 1, 1976, or $27.65625 per share. This is the number of shares of B & S stock which could have been sold within the 6-month period following the death of Frederick P. Stratton if advantage had been taken of the opportunity for maximum volume sales under SEC Rule 144. Because of this stipulation, the issue in this case involves only the value of the 211,973 remaining shares. The parties also agree that there are only two methods by which these remaining shares could be sold. One method would be a sale in a private placement of the stock pursuant to a representation by the purchaser that the shares were taken for investment and not with a view to sale or other disposition, and the other method of sale would be pursuant to a registered offering which might have been available to petitioner within several months after decedent's death if B & S agreed to prepare and file an appropriate registration statement with SEC.↩
2. The parties agree that in valuing the restricted shares sold pursuant to a secondary registration of the stock a discount for this risk factor should be allowed, but disagree as to the amount of such discount. Respondent contends that this discount should be.85 percent and petitioner contends it should be 5 percent. The parties disagree as to whether a discount for the 5 percent underwriters' commission and the cost of registration should be made, petitioner contending it should and respondent contending it should not.↩
3. See also, Estate of Sophia P. Brownell v. Commissioner,T.C. Memo. 1982-632↩.