ESTATE OF WILLIAM T. PIPER, SR., DECEASED, WILLIAM T. PIPER, JR., THOMAS F. PIPER, AND HOWARD PIPER, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2533–76.     Filed September 13, 1979.

*Donald C. Young,* for the petitioner.
*Russell F. Kurdys,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in William T. Piper, Sr.'s gift tax for 1969 in the amount of $411,839.57. The only issue for decision is the valuation of all the outstanding stock of two investment companies which was the subject of gifts from William T. Piper, Sr., to his son and to 11 trusts for the benefit of his grandchildren.

### FINDINGS OF FACT

Some of the facts were stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

William T. Piper, Sr. (Piper), died on January 15, 1970. His estate is the petitioner herein. The executors of his estate are his sons, Thomas F. Piper, William T. Piper, Jr., and Howard Piper.

Piper resided at Lock Haven, Pa. His gift tax return for the year 1969 was filed with the District Director of Internal Revenue at Pittsburgh, Pa.

The gifts reported on the gift tax return were made by Piper on January 8, 1969, and consisted of all the outstanding stock of Piper Investment Co. (Piper Investment) and Castanea Realty Co., Inc. (Castanea). The donees of the gifts were Piper's son, William T. Piper, Jr., and 11 trusts created by Piper, contemporaneously with the making of the gifts, for the benefit of each of 11 of his grandchildren.[1]

Piper Investment was incorporated in Nevada on December 8,

---

[1] The number of shares of each corporation that were given to each donee is as follows:

| Donee | Castanea | Piper Investment |
|---|---|---|
| W.T.P. Trust f.b.o. David W. Piper | 833 | 1,011 |
| W.T.P. Trust f.b.o. Patricia P. Devonshire | 833 | 1,011 |
| W.T.P. Trust f.b.o. Howard Piper, Jr | 834 | 1,009 |
| W.T.P. Trust f.b.o. Thomas F. Piper, Jr | 833 | 1,011 |
| W.T.P. Trust f.b.o. John R. Piper | 833 | 1,011 |
| W.T.P. Trust f.o.b. William H. Piper | 834 | 1,009 |
| W.T.P. Trust f.b.o. John T. Bolles | 500 | 607 |
| W.T.P. Trust f.b.o. Elizabeth L. Harford | 500 | 606 |
| W.T.P. Trust f.b.o. Thomas J. Harford, Jr | 500 | 606 |
| W.T.P. Trust f.b.o. Jane L. Harford | 500 | 606 |
| W.T.P. Trust f.b.o. Anne G. Harford | 500 | 606 |
| William T. Piper, Jr | 2,500 | 3,032 |
| Total | 10,000 | 12,125 |

As to the number of shares of Piper Investment given to W.T.P. Trust f.b.o. Thomas F. Piper, we have relied on the exhibit underlying the parties' stipulation of facts, William T. Piper's 1969 gift tax

1959. Castanea was incorporated in Pennsylvania on August 9, 1962. At all times relevant herein, Piper Investment had 12,125 shares of common stock outstanding, and Castanea had 10,000 shares of common stock outstanding. Neither corporation had any other class of stock.

Each of the corporations was funded at its inception by the transfer from Piper of Piper Aircraft Corp. (PAC) common stock in return for all the shares of stock of the new corporation. Piper transferred 25,000 shares of PAC common to Piper Investment in exchange for its 12,125 shares of common stock and transferred 45,000 shares of PAC common to Castanea in exchange for 10,000 shares of Castanea common stock. Piper had a basis of less than $1 per share in the PAC stock transferred to Piper Investment and Castanea. His basis in the shares of the new corporations received in these exchanges was the same as the basis of the PAC shares transferred.

Subsequent to these transfers, PAC approved a 1-for-2 stock dividend, so that, at the time of the gifts, Piper Investment held 37,500 shares of PAC common, and Castanea held 67,500 shares.

Castanea and Piper Investment were formed by Piper upon the advice of an accountant, Warren G. Lefort, in order to achieve certain tax planning objectives, while at the same time maintaining control of his PAC stock. Because of the dividends-received deduction for intercorporate dividends and corporate tax rates lower than Piper's individual income tax rates, Piper's transfer of PAC stock to the two wholly owned investment companies resulted in reduced income taxes on the dividends received with respect to that stock. Each corporation was structured to avoid the tax on personal holding companies by the receipt of a sufficient proportion of the corporation's income as rental income, and, after amendment of the personal holding company provisions of the Internal Revenue Code in 1964, by application of a sufficient amount of income to the retirement of qualified preexisting indebtedness.

In order to avoid classification as a personal holding company, each corporation acquired real estate. In 1961, Piper Investment

---

return, rather than the stipulation itself, since the number shown in the stipulation does not yield the correct total.

purchased real estate located in Overland, Mo., which it promptly leased, on a long-term basis, to the B. F. Goodrich Co.

Changes in Federal tax laws in 1964 made it necessary for Piper Investment to obtain additional income from real estate in order to continue to avoid the personal holding company tax.[2] Therefore, in 1966, Piper Investment purchased a leasehold interest in real estate located in Pittsburgh, Pa., which it promptly subleased to Mack Trucks, Inc., under a long-term lease.

Each purchase was financed, in part, by a mortgage loan and, in part, by funds obtained by borrowing from a commercial bank, using the PAC stock owned by Piper Investment as collateral.

On January 8, 1969, the fair market value of the real estate in Overland, Mo., owned by Piper Investment was $535,600 and the fair market value of the property held by Piper Investment in Pittsburgh, Pa., was $394,000.

Shortly after its formation in 1962, Castanea purchased real estate located in Staten Island, N.Y. Castanea promptly constructed thereon a warehouse building and leased the premises to B. F. Goodrich Co. on a long-term basis. The acquisition and construction were accomplished in part with proceeds of a mortgage loan and in part by borrowing from a commercial bank using the PAC stock owned by Castanea as collateral.

On January 8, 1969, the fair market value of the real estate in Staten Island owned by Castanea was $1,435,000.

Both Piper Investment and Castanea were on the cash method of accounting for financial reporting and tax purposes. The book value of the corporations on January 8, 1969, as reflected in their balance sheets attached to the gift tax return are shown in tables I and II:

---

[2]In reciting the reason for the formation of Piper Investment and Castanea and for the subsequent acquisition of real property by said corporations, the Court expressly does not intend to imply that the factual underpinnings of such transactions were necessarily as stated, since the issues potentially involved are not pertinent to the instant case.

TABLE I

## PIPER INVESTMENT CO.

ASSETS

| | |
|---|---|
| Cash in banks ................................................. | $14,221.79 |
| Deferred expenses ........................................... | 29,546.93 |
| Investment—37,500 shares of Piper Aircraft Corp. common stock .............................. | 1,212,500.00 |

Real property:

| | |
|---|---|
| Overland, Mo.—land and building ........ | $541,774.45 |
| Pittsburgh, Pa.—building .................... | 471,960.19 |

| | |
|---|---|
| Total .......................................................... | 1,013,734.64 |
| Total .......................................................... | 2,270,003.36 |

LIABILITIES

| | |
|---|---|
| Notes and mortgages payable ............... | 754,511.65 |
| Interest payable ................................. | 967.77 |
| Accrued expenses and other liabilities .... | 11,678.66 |
| State taxes payable ........................... | 1,013.66 |
| Federal income tax payable .................. | 1,812.83 |

| | |
|---|---|
| Total liabilities ............................................... | 769,984.57 |
| STOCKHOLDERS' EQUITY ........................................ | 1,500,018.79 |

TABLE II

## CASTANEA REALTY CO., INC.

ASSETS

| | |
|---|---|
| Cash in Pittsburgh National Bank ....................... | $19,122.43 |

Prepaid expenses:

| | | |
|---|---|---|
| Prepaid financing costs .................... | $24,897.86 | |
| Prepaid leasing costs ....................... | 4,666.92 | 29,564.78 |

| | |
|---|---|
| Investment—67,500 shares of Piper Aircraft Corp. common stock ............................ | 1,000,000.00 |
| Real Estate, Staten Island, N.Y.—land and building ................................. | 1,713,355.63 |
| Total .................................................... | 2,762,042.84 |

LIABILITIES

| | |
|---|---|
| Note payable .................................. | 17,600.00 |
| Mortgage payable ............................ | 1,295,618.66 |
| Federal income tax payable ................ | 2,170.00 |
| Accounts payable and accrued expenses ....................................... | 9,799.06 |

| | |
|---|---|
| Total liabilities ............................................. | 1,325,187.72 |
| STOCKHOLDERS' EQUITY ........................................ | 1,436,855.12 |

The amount at which the PAC shares were carried on Piper Investment's financial statements represented the aggregate market price of the shares on the date they were transferred by Piper to Piper Investment. The amount at which the PAC shares were carried on Castanea's financial statements represented the aggregate par value of the Castanea shares issued in exchange, each of which had a par value of $100.

The items carried on the corporations' books as deferred expenses or prepaid expenses represented professional fees incurred to obtain financing for real estate acquisition and to obtain leases which were being amortized over the duration of the financing and leases.

Tables III and IV summarize the income and expenses of Piper Investment and Castanea, respectively, for a 5-year period preceding, or, in the case of Castanea, including, the valuation date:

TABLE III

PIPER INVESTMENT CO.

Comparative Statement of Income and Expenses

FYE Nov. 30—

|  | 1968 | 1967 | 1966 | 1965 | 1964 |
|---|---|---|---|---|---|
| Net rental income | $18,072.49 | $12,880.65 | $11,638.41 | $10,554.47 | $8,214.17 |
| Dividends received | 52,500.00 | 52,500.00 | 56,250.00 | 50,625.00 | 37,500.00 |
| Interest income | 94.10 | --- | --- | --- | --- |
| Total income | 70,666.59 | 65,380.65 | 67,888.41 | 61,179.47 | 45,714.17 |
| Total general expenses | 20,338.73 | 19,413.69 | 23,748.72 | 7,827.82 | 12,579.42 |
| Income before Federal income tax | 50,327.86 | 45,966.96 | 44,139.69 | 53,351.65 | 33,134.75 |
| Federal income tax | 1,002.66 | 1,516.91 | --- | 2,270.49 | 71.81 |
| Net income | 49,325.20 | 44,450.05 | 44,139.69 | 51,081.16 | 33,062.94 |

TABLE IV

CASTANEA REALTY CO., INC.

Comparative Statement of Income and Expenses

FYE Feb. 28 or 29—

| Income: | 1969 | 1968 | 1967 | 1966 | 1965 |
|---|---|---|---|---|---|
| Rent income | $234,010.70 | $232,225.70 | $229,530.70 | $223,528.20 | $80,036.79 |
| Dividends received | 94,500.00 | 94,500.00 | 104,625.00 | 94,500.00 | 68,625.00 |
| Interest income | 586.40 | --- | --- | 18.57 | 423.63 |
| Total income | 329,097.10 | 326,725.70 | 334,155.70 | 318,046.77 | 149,085.42 |
| Total expenses | 224,065.52 | 229,715.36 | 234,459.93 | 230,525.46 | 138,071.00 |
| Net income before Federal income tax | 105,031.58 | 97,010.34 | 99,695.77 | 87,521.31 | 11,014.42 |
| Federal income tax | 2,858.50 | --- | --- | --- | --- |
| Net income | 102,173.08 | 97,010.34 | 99,695.77 | 87,521.31 | 11,014.42 |

The shares of Piper Investment and Castanea have never been registered with the Securities and Exchange Commission, listed upon any exchange, or dealt with through brokers or in over-the-

counter trading. There have been no private sales of the shares of either corporation, and no offers to purchase shares of either Castanea or Piper Investment have ever been communicated, directly or indirectly, to Piper's three sons who are the coexecutors of his estate and the cotrustees of the donee-trusts.

No dividends have ever been paid by either Castanea or Piper Investment nor has any salary nor other compensation ever been paid to any person who was a shareholder of either corporation.

PAC, a manufacturer of light aircraft, was incorporated in Pennsylvania in 1937. On January 8, 1969, its common stock was listed on the New York Stock Exchange. After August 10, 1969, such stock was listed on the Philadelphia-Baltimore-Washington Stock Exchange. At all times relevant herein, PAC had 1,644,890 shares of common stock issued and outstanding.

The 105,000 shares of PAC stock held by Castanea and Piper Investment had not been registered with the Securities and Exchange Commission. Neither Piper, Piper, Jr., the beneficiaries of the donee-trusts, nor the trustees of the donee-trusts possessed any contractual right to require the filing of a registration statement with the Securities and Exchange Commission or to annex shares to a registration statement otherwise being filed by Piper Aircraft Corp. No registration statement had been filed with the Securities and Exchange Commission on behalf of PAC from 1961 to January 8, 1969, and as of the latter date, no such filing by PAC was being contemplated.

On January 8, 1969, immediately prior to the gift of the stock of Piper Investment and Castanea, Piper owned 73,920 shares of PAC common stock, in addition to the 105,000 shares he held indirectly through these two wholly owned investment companies. On that date, the Piper family, including Piper, his spouse, his lineal descendants and their spouses, owned 465,783 shares of PAC common stock,[3] which was approximately 28 percent of the shares then outstanding.

On the date of the gift and for some time prior thereto, Piper was chairman of the board of PAC. On the date of the gift, his son, William T. Piper, Jr., was president of PAC; two other sons

---

[3]Although the stipulation of facts indicates that 465,783 was the number of shares owned by Piper's family, exclusive of Piper's shares, both parties in their proposed findings of fact indicate that Piper's shares were included in that number. It is unclear whether the 105,000 shares of PAC owned by Piper Investment and Castanea were included in the total of 465,783. In view of the conclusions reached herein, a resolution of these ambiguities is unnecessary.

were vice presidents; all three sons were on the board of directors, and there were four other directors.

On January 8, 1969, the average price of PAC common stock on the New York Stock Exchange was $53 per share. On that date, over 20,000 shares of PAC common stock were traded on the New York Stock Exchange. The weekly sales volume of PAC on the New York Stock Exchange for a period preceding and following the date of the gift was as follows:

*Week ending*

| | |
|---|---|
| 10/4/68 | 8,600 |
| 10/11/68 | 13,600 |
| 10/18/68 | 10,300 |
| 10/25/68 | 2,600 |
| 11/1/68 | 4,600 |
| 11/8/68 | 8,900 |
| 11/15/68 | 4,200 |
| 11/22/68 | 5,100 |
| 11/29/68 | 3,900 |
| 12/6/68 | 9,100 |
| 12/13/68 | 14,600 |
| 12/20/68 | 2,100 |
| 12/27/68 | 2,400 |
| 1/3/69 | 43,400 |
| 1/10/69 | 58,600 |
| 1/17/69 | 12,400 |
| 1/24/69 | 58,700 |
| 1/31/69 | 55,100 |
| 2/7/69 | 29,200 |
| 2/14/69 | 26,600 |
| 2/21/69 | 58,700 |
| 2/28/69 | 29,500 |

The average New York Stock Exchange trading volume of PAC for the period January 1968 through September 27, 1968, was approximately 9,000 shares per week and for 1967, the average was 20,000 shares per week.

The high and low prices at which PAC common traded on the

New York Stock Exchange, and subsequent to August 10, 1969, on the Philadelphia-Baltimore-Washington Stock Exchange,[4] for the period 1963 through 1969 were as follows:

|      | 1969 | 1968 | 1967  | 1966  | 1965  | 1964  | 1963  |
|------|------|------|-------|-------|-------|-------|-------|
| High | 81   | 72¼  | 56½   | 69¾   | 59¼   | 44½   | 41⅞   |
| Low  | 42   | 48   | 39½   | 32¼   | 33⅝   | 35¼   | 26⅜   |

In 1969, PAC was the target of a takeover attempt by Chris-Craft Industries, Inc. (Chris-Craft), a Delaware corporation, which culminated in a contest for control of PAC between Chris-Craft and Bangor Punta Corp. (Bangor Punta), a Delaware corporation. Between December 30, 1968, and January 22, 1969, Chris-Craft purchased over 200,000 shares of PAC stock. However, no official announcement of the takeover attempt was made to the public, nor was PAC management aware of such attempt, until January 23, 1969, when a cash tender offer for 300,000 shares at $65 per share was announced. Bangor Punta entered the contest for control when, on May 8, 1969, it reached a formal agreement with the Piper family for the sale of their PAC shares. The contest for control terminated on September 5, 1969, with Bangor Punta's attainment of a majority interest in PAC.

On the gift tax return filed on behalf of Piper for 1969, the Piper Investment stock was valued at $76.68 per share, and the Castanea stock was valued at $158.59 per share. These values were based on the net asset value of those corporations less a discount of 25 percent to account for the fact that each donee received a minority interest in each corporation. The net asset values of the two corporations were determined on the basis of the estimated fair market values of their underlying assets as of January 8, 1969, with the PAC stock valued at its mean New York Stock Exchange price on that day, $53, less a 37½ percent discount on account of securities law restrictions, blockage, and exposure to capital gains tax. In his notice of deficiency, respondent determined that the value of the Piper Investment stock on the valuation date was $101.89 per share, and the value of the Castanea stock was $226.15 per share.

---

[4]We note at this point that, in reaching our decision herein, we have given no effect to the findings relating to the listing, nor the prices at which PAC stock was traded, on the Philadelphia-Baltimore-Washington Stock Exchange.

## ULTIMATE FINDINGS OF FACT

On January 8, 1969, the value of the PAC stock held by Piper Investment and Castanea was $46.64 per share.

On January 8, 1969, the value of the stock of Piper Investment was $85.55 per share.

On January 8, 1969, the value of the stock of Castanea was $176.80 per share.

## OPINION

At issue is the valuation for gift tax purposes of the stock of two investment companies, Piper Investment Co. (Piper Investment) and Castanea Realty Co., Inc. (Castanea), as of January 8, 1969, the date on which William T. Piper, Sr. (Piper), made gifts of all the outstanding stock of each corporation to his son and to 11 individual trusts for the benefit of his grandchildren.

Section 2512(a)[5] provides that, if a gift is made in property, the value of the property at the date of the gift shall be considered the amount of the gift. The standard of valuation is the fair market value of the property which is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of the relevant facts. (Sec. 25.2512–1, Gift Tax Regs.) The statute, regulations, and rulings offer only generalized guidelines for the valuation of closely held stock. (See sec. 25.2512–2(f), Gift Tax Regs.; Rev. Rul. 59–60, 1959–1 C.B. 237; Rev. Rul. 77–287, 1977–2 C.B. 319) so that where, as in this case, the parties have been unable to reach an agreement as to valuation, we are left to resolve the issue through the process, necessarily imprecise, of weighing all facts and circumstances revealed by the entire record, with due regard to petitioner's burden of proof. *Messing v. Commissioner*, 48 T.C. 502, 512 (1967).

The parties have agreed on a basic approach to valuation. They propose that the net value of the assets held by the investment companies should be computed and that the net asset

---

[5] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year at issue, unless otherwise provided or indicated by the context.

All citations to the United States Code, the Code of Federal Regulations, and State statutory law are to the most recent year of publication, except where amendments, pertinent to our decision herein, and made subsequent to the taxable year in issue, necessitate reference to an earlier publication.

value should then be discounted, first, because of the undiversified portfolio held by the companies and, second, because of the difficulties inherent in marketing the stock of the investment companies. Petitioner also contends that certain other discounts should be applied. The parties differ on how they would value the assets of the investment companies and on the size of the discounts from net asset value which they would apply in arriving at the fair market value of the stock of the investment companies.

### *Net Asset Value*

Each of the investment company's assets consisted of cash, real estate, and Piper Aircraft (PAC) stock. In addition, each company carried on its balance sheet an item denominated "prepaid expenses" or "deferred expenses." The values of the real estate have been stipulated and the amounts of cash are not in dispute. Questions have been raised as to the valuation of the PAC stock and the prepaid or deferred expenses.

*Piper Aircraft stock.*—On the valuation date, Piper Investment held 37,500 shares, and Castanea held 67,500 shares, of PAC common stock, a stock listed on the New York Stock Exchange. The investment companies had acquired their PAC stock from Piper at the time of their formation.[6] Their PAC stock was unregistered, and Piper possessed no contractual right to have the shares registered.

For purposes of the gift tax, the fair market value of stock in a publicly held corporation is ordinarily deemed to be the mean between the highest and lowest quoted selling prices on the date of the gift. Sec. 25.2512–2(b), Gift Tax Regs. If, however, stock is subject to resale restrictions under the Federal securities laws which prevent it from being sold freely in the public market, a discount from market price may be necessary to measure the stock's value accurately. *Bolles v. Commissioner*, 69 T.C. 342 (1977); *Hirsch v. Commissioner*, 51 T.C. 121 (1968); *Husted v. Commissioner*, 47 T.C. 664 (1967).[7]

The issues we must decide are (1) whether the PAC stock owned by Piper Investment and Castanea was restricted stock,

---

[6]Their original holdings were subsequently increased as a result of a stock split. See p. 1064 *supra*.
[7]See also Rev. Rul. 77–287, 1977–2 C.B. 319.

and (2) if so, what discount from market price is necessary to account for the impact of the resale restrictions on market price.

The sale of unregistered securities in interstate commerce or through the mails is prohibited by section 5 of the Securities Act of 1933, 15 U.S.C. sec. 77e (1976), unless a specific exemption to the registration requirement is applicable. The applicability of the exemption provided in section 4(1) of the Securities Act, 15 U.S.C. sec. 77d (1) (1976), is in dispute herein. That section exempts "transactions by any person other than an issuer, underwriter, or dealer" from the registration requirement of section 5. "Underwriter" is defined in section 2(11), 15 U.S.C. sec. 77b (11) (1976), as "any person who has purchased from an issuer with a view to * * * the distribution of any security, or participates or has a direct or indirect participation in any such undertaking." For the purpose of section 2(11), the term "issuer" includes, in addition to an issuer, "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." A distribution of stock within a relatively short time after acquisition would be evidence that it was originally acquired with an intent to distribute rather than with an investment intent. 1 L. Loss, Securities Regulation 552 (2d ed. 1961). Thus, restrictions exist on the resale of unregistered stock acquired from a "control person"; and the unregistered PAC stock would be restricted if considered to be stock held by "control persons" or stock acquired from a "control person" with a view to distribution.

Petitioner contends that the section 4(1) exemption was not available and the PAC stock was restricted stock because Piper, and through him, Piper Investment and Castanea, were "control persons." Respondent's position is that petitioner has not satisfied its burden of proof that Piper, Piper Investment, or Castanea was a "control person" or a statutory underwriter; the section 4(1) exemption was, therefore, applicable and the PAC stock was not restricted. Alternatively, respondent contends that if the foregoing were "control persons," petitioner has not sustained its burden of proving that their control was of such a nature that they could not have compelled registration of the PAC stock with the result that, although such stock would be considered restricted, the only elements of discount to be taken into account are the costs involved in registration and the

possible impact of registration on the market price at which such stock was publicly traded on January 8, 1969. For the reasons hereinafter stated, we agree with respondent's alternative contention.

The concept of "control" in section 2(11) is a broad one and is not limited to ownership of a majority of the outstanding stock of a corporation. H. Rept. 85, 73d Cong., 1st Sess. 14 (1933). Control has been defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Securities and Exchange Commission rule 405, 17 C.F.R. sec. 230.405 (1978). The concept is "not a narrow one" (*Pennaluna & Co. v. Securities and Exchange Com'n*, 410 F.2d 861, 866 (9th Cir. 1969)) and its existence is "not to be determined by artifical tests" (*United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976)). "Control" may be found where a person is a member of a group which possesses the power to influence management. *Securities & Exch. Com'n v. Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Securities & Exch. Com'n v. American Beryllium & Oil Corp.*, 303 F. Supp. 912, 915 (S.D. N.Y. 1969); 2 L. Loss, Securities Regulation 779–781 (2d ed. 1961). In short, "control" is a question of fact to be determined by an evaluation of the totality of circumstances of any particular case, including voting power as well as other means of influence upon the management and policies of a corporation. *United States v. Corr, supra* at 1050; *Pennaluna & Co. v. Securities and Exchange Com'n, supra* at 866; 2 L. Loss, *supra* at 780–781.

On January 8, 1969, the Piper family, including Piper, his spouse, his lineal descendants, and their spouses, owned 465,783 shares of PAC common stock, approximately 28 percent of the 1,644,890 shares then outstanding. Piper personally held 73,920 shares and through Piper Investment and Castanea held another 105,000 shares. Thus, directly and indirectly he held nearly 11 percent of the PAC stock. Piper was chairman of the board of directors of PAC and, of the other seven directors, three were his sons. His sons were also the chief officers of the corporation. Under these circumstances, we believe that petitioner is correct in concluding that Piper, because of his own and his family's stock ownership and management position, would be regarded by the Securities and Exchange Commission as a "control

person" and would have to govern his transactions in PAC stock accordingly.

Petitioner contends that, because Piper was a "control person," Piper Investment and Castanea were through Piper in indirect control of, or under common control with, PAC and their PAC stock was, therefore, restricted stock. Although we agree with petitioner that the PAC stock must be valued as restricted stock, for the reasons explained below, we reach this conclusion via a different route than that followed by petitioner.

Piper was the sole owner of Piper Investment and Castanea, and he had created those corporations to hold some of his PAC stock for the purpose of gaining certain tax advantages and retaining control of that stock. Their only other substantial asset was real estate under long-term leases. Under these circumstances, a sale by Piper of the Piper Investment and Castanea shares might well be regarded as an indirect transfer by him, a "control person," of the PAC stock as a result of which purchasers could not immediately resell their shares without being considered statutory underwriters.[8] The reference to an indirect participation in a distribution in the definition of "underwriter" in section 2(11) appears to us broad enough to cover such a case.

We have found no authority on point, other than a general indication in the case law, that where a "control person" utilizes an intermediary or conduit in the distribution of unregistered stock to the public, the intermediary or conduit will be disregarded in determining whether the requirements of the Securities Act have been satisfied. *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 678–679 (4th Cir. 1967); *United States v. Re*, 336 F.2d 306, 317 (2d Cir. 1964); *Securities & Exch. Com'n*

---

[8]Under this theory, the sec. 4(1) exemption would not be available despite the fact that, as respondent correctly points out, Piper Investment and Castanea would not ordinarily be regarded as statutory underwriters merely on the grounds that they had originally acquired their PAC stock, in 1959 and 1962, respectively, from a "control person" because of the long period of time during which they had held their stock. See 1 L. Loss, Securities Regulation 671–672 (2d ed. 1961).

Moreover, although we are mindful of the fact that shares once owned by "control persons" do not necessarily retain their "control" characteristics in the hands of subsequent owners (*United States v. Sherwood*, 175 F. Supp. 480, 483 (S.D. N.Y. 1959)), the basis upon which our decision herein rests renders it unnecessary to delve into the nuances involved in determining whether Piper Investment and/or Castanea were "control persons" of PAC, would remain "control persons" of PAC subsequent to the transfer of the shares of those corporations by Piper to a purchaser, or could otherwise sell their PAC stock under such circumstances that a purchaser from them would be free of restrictions under the securities law. See also n. 14 *infra*, in respect of the application of the exemption contained in SEC rule 154.

*v. Mono-Kearsage Con. Min. Co.*, 167 F. Supp. 248, 256 (D. Utah 1958). However, because of the potential for abuse of the securities laws, if the registration requirements could be avoided merely by the formation of a holding company,[9] we think that a significant risk existed that the Securities and Exchange Commission would characterize a sale of the stock of Piper Investment and Castanea in the manner we have described. Because the burden is on the party relying on an exemption to the registration requirements to prove its applicability[10] and because of the sanctions against violation of those requirements,[11] we think that there was a substantial risk that the section 4(1) exemption would be inapplicable. We, therefore, conclude that Piper would not be a willing seller of, and he would find no willing buyer for, the Piper Investment and Castanea stock unless the sale was based on an understanding that the unregistered PAC stock was to be regarded as restricted stock.[12] See *Hirsch v. Commissioner*, 51 T.C. at 135.

The parties differ in their assessments of the impact of the restrictions of the securities law on the value of the PAC stock.[13] Petitioner contends that the stock could be disposed of effectively only through a private placement at a substantial discount from market price, while respondent takes the position that the stock could have been registered and that the discount from market price should not exceed the costs involved in registering the PAC stock and selling the registered stock.[14]

---

[9]Consider the possibility of a "control person" of corporation X setting up a shell corporation Y to which he contributed some of his X shares. If the "control person" could then, after Y had held the shares for a number of years sufficient to negate a view to distribution, sell his Y shares, and the purchaser could cause Y to sell the X shares without registration, the "control person" could circumvent the requirements of sec. 5 of the Securities Act.

[10]*S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 126–127 (1953); *Pennaluna & Co. v. Securities and Exchange Com'n*, 410 F.2d 861, 865 (9th Cir. 1969).

[11]Securities Act of 1933, sec. 12, 48 Stat. 84, 15 U.S.C. sec. 77l (1976) (civil liability); Securities Act of 1933, sec. 20, 48 Stat. 86, 15 U.S.C. sec. 77t (1976) (SEC enforcement proceedings); Securities Act of 1933, sec. 24, 48 Stat. 87, 15 U.S.C. sec. 77x (1976) (criminal penalty).

[12]We recognize the possibility that doubts about the status of the PAC stock could have been resolved by an SEC no-action letter. We do not believe, however, that a favorable ruling would have been forthcoming. Our opinion in this regard is based on our own evaluation of the circumstances and on the testimony of petitioner's expert witness, Mr. Hehmeyer, who had substantial experience in the securities field and testified as to the situations in which his experience indicated no-action letters would not be issued.

[13]Both parties presented testimony and written reports of witnesses on securities valuation and on procedural aspects of stock registration. We consider it unnecessary to review their qualifications in detail here. We have, however, considered those qualifications, where relevant, in determining the weight to be given the witnesses' testimony.

[14]Respondent also argues that part of the PAC stock, although restricted, could be sold without

A "control person" has been defined to include someone who possesses the power to compel an issuer to file a registration statement. *Securities & Exch. Com'n v. Chem. Dev. Corp.*, 469 F.2d at 27; *Securities & Exch. Com'n v. American Beryllium & Oil Corp.*, 303 F. Supp at 915; H. Rept. 85, 73d Cong., 1st Sess. 13–14 (1933). Therefore, respondent argues that if Piper was, as we have found, a "control person" of PAC, it follows automatically that he could have compelled PAC to register the stock, although he possessed no contractual rights to have the stock registered.[15] Petitioner asserts that a "control person" may possess the power to compel a registration statement in a technical legal sense and yet be prevented by various practical impediments from exercising that power.

Petitioner further contends that the filing of a registration statement, in respect of stock held by a "control person," might violate that person's fiduciary duty to other shareholders, might require the premature disclosure of inside information, and might expose the corporation to liability for misstatements. Furthermore, petitioner states that a divergence of interests among a "control group" might prevent a "control person" from compelling registration of his stock and that, in any case, registration would entail delay and expense.

We agree with petitioner that, in a particular case, any of these considerations might prevent a "control person" from compelling an issuer to file a registration statement. But, while correct in theory, petitioner has failed to draw a connection between these theoretical difficulties and the actual circum-

---

registration under SEC rule 154, 17 C.F.R. sec. 230.154 (1971), effective on Dec. 22, 1954 (Securities Act Release No. 3525), and rescinded as of Apr. 15, 1972 (Securities Act Release No. 5223, Jan. 11, 1972), which allowed the sale of limited quantities of restricted securities by a control person in the open market. We have concluded, however, that under the circumstances of this case, given the requirement that the distribution must not be part of a plan involving shares in aggregate amounts exceeding the limits of rule 154, it would not be possible to separate out from the total number of shares gifted on Jan. 8, 1969, and separately value that number of shares which would not have exceeded the limit. Consequently, rule 154 would have had limited, if any, application, and would have had no measurable effect on the price a purchaser would pay for the stock of Piper Investment or Castanea. The benefits of the rule are not available to a seller who is deemed an underwriter. 4 L. Loss, Securities Regulation 2669 (Supp. 1969); SEC Securities Act Release No. 4818 (Jan. 21, 1966). Since we have indicated (p. 1075 *supra*) that a purchaser of the Piper Investment or Castanea stock might be deemed an underwriter with respect to the PAC stock, we doubt the availability of rule 154 for the sale of PAC stock by a purchaser of Piper Investment and Castanea. We note that neither of respondent's valuation experts relied on the rule as a basis for their determination. See *Bolles v. Commissioner*, 69 T.C. 342, 353 n.5 (1977).

[15]Only PAC, the issuer of the stock, could file a registration statement with respect thereto. Securities Act of 1933, sec. 6, 48 Stat. 78, 15 U.S.C. sec. 77f (1976).

stances of Piper, Piper Investment, and/or Castanea and PAC on the valuation date. None of petitioner's witnesses (who did not include any officer or director of PAC) did anything more than speculate, in abstract terms, as to what those circumstances might have been. Such speculation is insufficient to satisfy petitioner's burden of proof.

Petitioner has not proven that a registration statement could not have been filed with respect to the PAC stock held by the investment companies without a violation of the fiduciary duty owed to the shareholders of PAC by the Piper family or the other directors. We are not convinced that if the Pennsylvania statute dealing with contracts between directors and a corporation (15 Pa. Stat. Ann. tit. 15, sec. 1409.1 (Purdon Supp. 1978)), were applicable as petitioner contends, its provisions could not have been satisfied. The conditions of that statute are stated in the alternative, and a contract is not voidable under it if, inter alia, it is fair to the corporation at the time authorized, approved, or ratified by the shareholders or the board of directors. With regard to Piper's ability to secure authorization by the board of directors of PAC, see p. 1079 *infra*.

Petitioner offered no authority to support its position that under Pennsylvania law a transaction is "fair" to the corporation only if an actual benefit is conferred on the corporation and not if the corporation merely suffers no detriment; and, we are unable to conclude on the record before us that PAC or its shareholders would be harmed by registration of the stock held by Piper Investment and Castanea. Although PAC had made no public offering for a number of years and did not contemplate an offering in 1969, its stock was publicly traded and there was no evidence that any corporate policies existed which would have been frustrated by a registration of the 105,000 shares or that such a registration would have been deleterious to other PAC shareholders. In 1967, an average of 20,000 shares per week of PAC stock had been traded on the New York Stock Exchange. From January 1968 through September 27, 1968, the average was approximately 9,000 per week and from September 27, 1968, through December 27, 1968, the average weekly trading volume was nearly 7,000 shares. In light of these trading volumes, we have no reason to believe that an underwriter could not have timed the marketing of the 105,000 shares owned by Piper

Investment and Castanea in such a manner as to avoid an adverse effect on the price of PAC stock.

We recognize that a registration statement is more carefully scrutinized by the Securities and Exchange Commission than the reports regularly filed by a corporation and requires data covering a more extended time period. M. Cohen, "Truth in Securities" Revisited, 79 Harv. L. Rev. 1340, 1354, 1356 (1966). But, petitioner has not presented any evidence to show that, on the valuation date, any inside information existed which the corporation would not have wished to disclose or that any of the required data was unavailable for other reasons. In this connection, we note that there was no evidence that, on the date of the gift, PAC management was aware of the takeover attempt by Bangor Punta. Compare *Horwith v. Commissioner*, 71 T.C. 932 (1979).

The hard facts are that through stock ownership and officers and directorships (see pp. 1068–1069, 1074–1075 *supra*) Piper and the Piper family had "special access to the centers of corporate authority [of PAC] or the power, actual or presumed to influence the exercise of that authority," i.e., a special status. See Institutional Investor Study, Report of the Securities and Exchange Commission, H.R. Doc. No. 92–64, 92d Cong., 1st Sess. xxix (1971) (hereinafter the Institutional Investor Study). To be sure, four of the eight directors were not members of the Piper family but petitioner admits that "all of the directors were doubtless under the influence of decedent [Piper]." See petitioner's reply brief, p. 29. Nor does the record contain any evidence of any divergence of interest among members of the Piper family on the valuation date.

In sum, although we are fully cognizant of all the difficulties in the registration process, on this record we must conclude that petitioner has failed to sustain its burden of proving that the stock in question could not have been registered.[16]

---

[16]Presumably, such a registration would have had to occur prior to the sale by Piper to the hypothetical purchaser of the Piper Investment and Castanea stock. In *Bolles v. Commissioner*, n. 14 *supra*, upon which petitioner heavily relies, the Court found that the Piper family were members of a control group of Bangor Punta Corp. but did not deal directly with the potential for registration, although it did indicate that the taxpayer therein had *no right* to compel amendment of the BPC registration statement. (See 69 T.C. at 353.) But, as petitioner has pointed out on brief (petitioner's reply brief, p. 23), the Piper family had "control" within the meaning of the securities law of only about 11 percent of BPC stock, considerably less than the 28 percent of PAC stock involved herein. The contrast between *Bolles* and the instant case highlights the principle that the power to compel registration turns on a factual inquiry in each case.

We turn now to an evaluation of the PAC stock held by Piper Investment and Castanea in the context of its potential for registration. In so doing, we recognize that registration has its costs and is time consuming, although the impact of these elements is less in view of the fact that PAC stock had previously been registered and was being traded on the New York Stock Exchange, see Institutional Investor Study, *supra* at xxvii. The PAC stock held by Piper Investment and Castanea, if registered, could have been sold on the New York Stock Exchange. Where stock can be sold on a stock exchange, the price at which the stock is sold on the exchange is usually the best evidence of the value of such stock. *Hazeltine Corp. v. Commissioner*, 89 F.2d 513, 519 (3d Cir. 1937), revg. on another issue 32 B.T.A. 110 (1935); *Moore-McCormack Lines, Inc. v. Commissioner*, 44 T.C. 745, 759 (1965).

On January 8, 1969, PAC stock was being actively traded at $53 per share on the New York Stock Exchange. This price was within the range of the high and low prices in each of the previous 4 years and cannot be considered aberrant. Under these circumstances, we consider the New York Stock Exchange price of $53 to be the best evidence of the fair market value of registered PAC stock on the valuation date.[17]

Respondent's witness, Mr. O'Farrell, testified that the costs of registration and distribution (including the risk of price change during the registration period) of the PAC stock would equal 12 percent of its value.[18] Petitioner does not argue that 12 percent does not represent the costs of registration and marketing, relying exclusively on its argument, which we have rejected, that the stock could not have been registered. Petitioner's expert witness, Mr. Williams, acknowledged that 12 percent was a reasonable estimate of such costs. Accordingly, we hold that the value of the PAC stock held by Piper Investment and Castanea

[17]Because petitioner has failed to bear its burden of proving that the PAC stock could not have been registered and sold on the New York Stock Exchange, the testimony of petitioner's valuation expert, Mr. Williams, as to how a buyer of the PAC stock in a private placement would determine its intrinsic value, is not relevant. Similarly, certain damage suits pending against PAC, which petitioner argues would have affected the intrinsic value of the PAC stock, are not relevant because the extent of that potential liability was publicly available information and had presumably already been incorporated into the public trading price.

[18]Respondent's other valuation expert, Dr. Mock, proposed that it was inappropriate to apply any discount at all for the costs of registration. Respondent has, however, not adopted this position and has indicated on brief that if the stock is to be valued as restricted stock then he believes the 12-percent discount employed by Mr. O'Farrell to be appropriate.

was the New York Stock Exchange price of $53 less a 12-percent discount for costs of registration and sale or $46.64 per share.[19]

*Prepaid or deferred expenses.*—As of January 8, 1969, Piper Investment and Castanea carried on their balance sheets items labeled deferred or prepaid expenses which reflected professional fees incurred in connection with mortgage financing and preparation of leases. These fees were being amortized over the period of the loans or the term of the leases, respectively.

Petitioner argues that these expenses were actually costs of other assets and that a prospective purchaser of the investment company stock would assign them no separate value, except possibly insofar as the purchaser would receive an indirect tax benefit from the amortization of those expenses. Respondent argues that the expenses were an intangible asset with a value apart from their tax benefit, and should be included in the net assets of the investment companies at book value since there is no other evidence of their value.

We believe that petitioner is correct in its assertion that the expenses for preparation of leases were costs of acquiring those leases and that the expenses incurred in connection with obtaining loans were, although one step removed, also costs of obtaining assets reflected on the balance sheet. Therefore, to the extent that these expenses had any value, apart from a tax benefit, that value was already reflected in the values assigned to other assets and it would be double counting to include both the costs of acquiring the assets and the value of those assets in computing net asset value.

Respondent's reliance on *Lovejoy v. Commisioner*, 18 B.T.A. 1179 (1930), and similar cases, which hold that fees paid for obtaining financing and long-term leases are deductible over the life of the loan or lease, is misplaced. The fact that a proper reflection of income for income tax purposes requires amortization of such expenses does not signify that those expenses would have a value to a prospective purchaser, independent of the assets for which the expenditures were made and apart from the income tax benefit of amortization.

Insofar as the value of the tax benefit from the expenses is

---

[19]With respect to the risk of price change during the period of actual distribution, we have already indicated that the marketing could have been accomplished without adverse effect (see pp. 1078–1079 *supra*). We think that the risk of price change during the registration period, already incorporated in the 12 percent, adequately takes into account any possible error in this conclusion.

concerned, petitioner admits that it exists, but asserts that it is so small and speculative that it should be disregarded. Comparing the $5 million plus total net asset value of Piper Investment and Castanea which we have found with the gross book value of less than $60,000 for the expenses, we think that a prospective purchaser would ignore such tax benefit and we, accordingly, assign it no value.[20]

Thus, we hold that the net asset value of Piper Investment on January 8, 1969, was $1,922,837 or $158.58 per share[21] and the net asset value of Castanea was $3,277,134 or $327.71 per share.[22]

## Portfolio Discount

The parties agree that because of the investment companies' nondiversified portfolios, the value of the stock of Piper Investment and Castanea was less than their net asset values. However, the size of the discount necessary to account for this discrepancy is in dispute. Respondent argues that the discount should be 10 percent, a value in between the values proposed by his two expert witnesses. Petitioner contends that the discount should exceed 17 percent, the higher of the two values suggested by respondent's experts, but neither petitioner nor its expert witnesses suggested a specific value for the portfolio discount.

Respondent's valuation experts, Mr. O'Farrell and Dr. Mock, took similar approaches to the problem of determining the portfolio discount.

Dr. Mock proposed a discount of 7.7 percent below net asset value based on the average discount from net asset value of the prices of 14 nondiversified investment companies. Mr. O'Farrell found that the relation of market price to net asset value of 24 publicly traded closed-end investment companies ranged from a discount of 16.7 percent to a premium of 82.4 percent and concluded that because of Piper Investment's and Castanea's relatively unattractive portfolios, the highest discount, approximately 17 percent, should be applied.

---

[20]We would, in any event, find it virtually impossible to develop a value for such tax benefit. The record contains no information as to the terms of the loans and incomplete information as to the terms of the leases. In addition, neither party has offered the Court any assistance in determining the value of the tax benefit or the elements to be considered in arriving at such a value.

[21]37,500 shares of PAC at $46.64 or $1,749,000; real estate at stipulated values of $535,600 and $394,000; cash of $14,222; minus liabilities of $769,985.

[22]67,500 shares of PAC at $46.64 or $3,148,200; real estate at stipulated value of $1,435,000; cash of $19,122; minus liabilities of $1,325,188.

While we consider Dr. Mock's approach somewhat superior to that of Mr. O'Farrell because Dr. Mock limited his analysis to nondiversified investment companies, we believe that he erred in selecting the average discount of the nondiversified investment companies he considered. The weight of the evidence indicates that the portfolios of Piper Investment and Castanea were less attractive than that of the average nondiversified investment company. We reject respondent's attempt to bolster Dr. Mock's position by reference to the premiums above net asset value at which certain investment companies, either diversified or specialized in industries other than light aircraft, were selling. Those companies simply are not comparable to Piper Investment and Castanea, nondiversified investment companies owning only realty and PAC stock.

In particular, respondent points to the 29-percent premium above asset value at which National Aviation, a specialized investment company, was selling. The evidence shows, however, that National Aviation did not own stock in light aircraft manufacturers such as PAC.

Furthermore, contrary to respondent's contention, purchases of PAC stock by Chris-Craft and Bangor Punta do not indicate a general investor interest in aircraft stocks and are not relevant herein because they occurred, for the most part, after the valuation date and were made during a contest for control between those two companies.

On the other hand, we are hampered in our evaluation of the testimony of petitioner's valuation expert, Mr. Williams, because petitioner has failed to supply us with any data with which to analyze Mr. Williams' statements. He stated that the only conclusion that could be drawn from the list of companies from which Dr. Mock derived his discount was that an inverse correlation existed between the size of an investment company's assets and the size of the discount from net asset value, and that, because of their small size, Piper Investment and Castanea were comparable only to the three smallest companies considered by Dr. Mock, for which the discounts averaged over 40 percent. Since petitioner has presented no data to enable us to evaluate the validity of Mr. Williams' statements, we can accord them little weight.

Petitioner has also failed to introduce specific data to support its assertion that Piper Investment and Castanea were substan-

tially inferior to the worst of the companies considered by Mr. O'Farrell. Petitioner made no attempt to elicit evidence as to the portfolios of the companies considered by Mr. O'Farrell, and its expert witness commented only on Dr. Mock's, and not on Mr. O'Farrell's, report. We have only the fact that the companies considered by Mr. O'Farrell were publicly traded from which to infer that their portfolios were superior to those of Piper Investment and Castanea. We have taken account of the lack of a public market for the stock of Piper Investment and Castanea separately. See pp. 1084–1086 *infra*.

On the basis of the record before us, we conclude that the discount selected by Dr. Mock was too low, but that there is insufficient evidence to support petitioner's position that the discount should be higher than that proposed by Mr. O'Farrell. Therefore, we find that 17 percent is an appropriate discount from net asset value to reflect the relatively unattractive nature of the investment portfolios of Piper Investment and Castanea.[23]

### Discount for Lack of Marketability

The stock of Piper Investment and Castanea was unregistered and unlisted. From the time of their formation until the valuation date, the stock of those companies was owned entirely by Piper. There had been no transactions in the stock and Piper's sons, the coexecutors of his estate, were unaware of any offers to purchase the stock having ever been made.

Both respondent's witness, Mr. O'Farrell, and petitioner's witness, Mr. Williams, were of the opinion that because Piper Investment and Castanea were unknown to the public, their stock was unregistered, and their specialized assets had limited public appeal, the most suitable means of sale of the stock of those corporations would have been through a private placement. We find this reasoning persuasive and reject the position of Dr. Mock that a discount based on the costs of a secondary public offering should be employed since we find no support in the record for his premise that a public distribution would be an efficient method of disposing of the Piper Investment and Castanea stock.[24] The situation in respect of the stock of these

[23]After applying the portfolio discount, but prior to applying the discount for lack of marketability, the stock values are as follows: Piper Investment, $131.62 per share; Castanea, $272 per share.

[24]Respondent again tries to bolster Dr. Mock's position by reference to the Chris-Craft and Bangor Punta purchases during their contest for control of PAC subsequent to the valuation date and the

two companies stands in sharp contrast to the situation vis-a-vis the PAC stock where a previously registered and actively traded listed security was involved.

Respondent argues that any further discount for the costs of disposing of the Piper Investment and Castanea stock beyond the costs of a registration and public offering is rendered superfluous by the discounts for restrictions on the PAC stock and for the nondiversified nature of the investment companies' assets. However, because there was no established public market for the stock of Piper Investment and Castanea, and because the gifts were of minority interests in the investment companies,[25] we believe that an investor would consider a purchase of the stock, which was the subject of the gifts, to involve risks and disadvantages which a direct investment in PAC stock would not entail and which are additional to the weaknesses in the investment companies' portfolios.

Mr. O'Farrell determined that a further discount of 24 percent would be necessary to sell the Piper Investment and Castanea stock in a private placement. He derived this discount from the Institutional Investor Study, *supra.* See also Rev. Rul. 77–287, 1977–2 C.B. 319. Petitioner accepts the Institutional Investor study as a proper source for determining the discount but contends that Mr. O'Farrell did not make proper use of the study in deriving his discount.

In particular, petitioner argues that Mr. O'Farrell's use of the average discount from ordinary public trading market price in private placements for a period beginning January 1, 1966, and ending in mid–1969 was incorrect because the time period covered was too long and certain negative attributes of Piper investment and Castanea were not reflected in the average. Petitioner claims that the correct discount to be derived from the Institutional Investor Study is 43.8 percent.

We have examined the Institutional Investor Study in light of the objections raised by petitioner.[26] The study reveals an upward trend in the average discount throughout the period

---

premium over net asset value at which National Aviation, a specialized investment company, which did not invest in stock of light aircraft manufacturers, sold. We find these facts irrelevant to the question of whether a public market existed for the stocks of Piper Investment and Castanea.

[25]Petitioner has made no claim for a discount for "blockage" and, indeed, any such claim would be of doubtful validity. See *Rushton v. Commissioner,* 60 T.C. 272 (1973), affd. 498 F.2d 88 (5th Cir. 1974).

[26]Petitioner raises some points which would affect all private placements of common stock, such as an increasing supply of private placements during the period in question and a preference for debt

studied, January 1966 through June 1969, with a higher than average discount for the stock of companies with relatively low earnings. Institutional Investor Study, *supra* at 2454, table XIV–50. The study also shows a preference for purchases direct from the issuer in private placements of stocks of closely held companies rather than secondary securities. Institutional Investor Study, *supra* at 2416 n. 86, 2419. Furthermore, a stock with a less active public market tended to sell in private placements at a higher discount. Institutional Investor Study, *supra* at 2445. The study also indicates that investment advisers were unlikely to be purchasers of stock like that of Piper Investment or Castanea, though it does not indicate, as petitioner would have us believe, that only a venture capital company would purchase that stock since a considerable proportion of the private placements with banks and life insurance companies involved restricted common stocks of privately held companies. Institutional Investor Study, *supra* at 2419.

After carefully reviewing the Institutional Investor Study and considering all the arguments raised by petitioner and respondent, we conclude that a further discount of 35 percent would have been required in a private placement of the Piper Investment and Castanea stock, in view of conditions in the private placement market on the valuation date, the possible purchasers of the stock in a private placement, and the earnings and other attributes of Piper Investment and Castanea.

After applying the discount for the weaknesses in Piper Investment's and Castanea's portfolios and the 35-percent discount required to market their stock in private placements, we arrive at a per-share value of $85.55 for Piper Investment and $176.80 for Castanea.

### Miscellaneous Factors

Petitioner argues that certain other factors diminished the value of Piper Investment and Castanea and should be taken into account in our determination.

First, petitioner proposes a discount for potential capital gains

---

over equity on the part of purchasers in private placements. These factors would already be incorporated in the average discount for common stock placements during the relevant period and need not be separately considered.

tax at the corporate level because Piper Investment and Castanea had a basis of less than $1 per share in their PAC stock. We consider such a discount unwarranted under the net asset valuation technique employed herein, where there is no evidence that a liquidation of the investment companies was planned or that it could not have been accomplished without incurring a capital gains tax at the corporate level.[27] *Estate of Cruikshank v. Commissioner*, 9 T.C. 162 (1947).[28] Cf. *Estate of Robinson v. Commissioner*, 69 T.C. 222 (1977). Nothing in *Obermer v. United States*, 238 F. Supp. 29 (D. Haw. 1964), cited by petitioner, persuades us otherwise.

Petitioner also urges that the value of the gift should be discounted for the gift tax due thereon. Where a donee incurs an obligation to pay the donor's gift tax as a condition upon receipt of the gift, the value of the gift for gift tax purposes does not include the amount of the gift tax because, to that extent, the donor did not intend to make a gift. *Harrison v. Commissioner*, 17 T.C. 1350 (1952).[29] See also *Turner v. Commissioner*, 49 T.C. 356 (1968), affd. 410 F.2d 752 (6th Cir. 1969). However, petitioner does not assert that the donees were obligated to pay Piper's gift tax and there is nothing in the record to suggest that Piper so intended. Moreover, the evidence is insufficient to conclude that eventual liability for the gift tax will rest with the donees. Therefore, there is no basis for reducing the value of the gift by the amount of gift tax due.

Finally, petitioner has pointed to a number of other features of the investment companies which it alleges reduced their net asset value including, inter alia, that the companies were managed without attention to the quality of their investments and that the real estate was subject to long-term leases and to substantial mortgages. We have considered these and all other points raised by petitioner. Any reduction in the net value of the

---

[27] If the purchaser had been an individual, the use of sec. 337 would have afforded the opportunity to avoid the capital gains tax at the corporate level, and any gain at the shareholder level would have reflected only the increase in value of the assets subsequent to the purchase. If the purchaser were a corporation, the same opportunity with similar consequences would have been afforded under secs. 332 and 334(b)(2). See *Bijou Park Properties, Inc. v. Commissioner*, 47 T.C. 207, 213–214 (1966). See also *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950). Compare discusssion in *Wilcox Manufacturing Co. v. Commissioner*, T.C. Memo. 1979–92.

[28] See also *McTighe v. Commissioner*, T.C Memo. 1977–410; *Gallun v. Commissioner*, T.C. Memo. 1974–284; *Estate of Thalheimer v. Commissioner*, T.C. Memo. 1974–203, affd. on this issue and remanded 532 F.2d 751 (4th Cir. 1976).

[29] See also *Lingo v. Commissioner*, T.C. Memo. 1954–31.

assets caused by these factors has already been taken into account either through the stipulated values of the real estate or through the portfolio discount and discount for lack of marketability.

In accordance with our findings, we hold that the stock of Piper Investment had a value of $85.55 per share and the stock of Castanea had a value of $176.80 per share on the valuation date.

*Decision will be entered under Rule 155.*