ESTATE OF T. JOHN FOLKS, JR., Deceased, CHARLES R. CARROLL and BERNICE M. FOLKS, Co-Executors, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Folks v. Commissioner
Docket No. 2023-75.
United States Tax Court
T.C. Memo 1982-43; 1982 Tax Ct. Memo LEXIS 710; 43 T.C.M. (CCH) 427; T.C.M. (RIA) 82043; January 29, 1982. Donald A. Goldsmith,Thomas J. Lennon, and T. Randolph Harris, for the petitioner. Michael N. Balsamo,Victoria Wilson, and Michael A. DeLuca for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency of $ 272,595.93 in the Federal estate tax of petitioner, subject to an additional credit for state death taxes allowable. The issues for decision are: (1) the proper valuation of decedent's shares of stock in two closely held corporations; (2) whether certain shares of stock held by the decedent as a custodian under the New York Uniform Gifts to Minors Act for *713 his son, Joseph A. Folks, are includable in the gross estate pursuant to section 2038; [1] and (3) whether the Court should enter its decision herein under Rule 155 to preserve, as a deduction from petitioner's gross estate, an income tax deficiency proposed against the decedent and his widow for their taxable year 1971. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Decedent, T. John Folks, Jr., died on April 12, 1971. His will was probated, and Bernice M. Folks and Charles R. Carroll were appointed co-executors of his estate on June 21, 1971. The petitioner herein is a New York estate. At the time the petition was filed Bernice M. Folks and Charles R. Carroll resided in Amityville, New York, and Massapequa, New York, respectively. The co-executors filed the Federal estate tax return of the petitioner with the Office of Internal Revenue Service at Brooklyn, New York. At the time of his death the decedent was the chairman of the board of directors and the chief executive officer of *714 Lumber Realty Corporation (hereinafter Lumber Realty). Lumber Realty is a closely held real estate investment company which was organized in New York State prior to 1930 to engage in all phases of the real estate business and to hold certain investments. On April 12, 1971, Lumber Realty owned 16 parcels of improved and unimproved real estate in various locations throughout Nassau and Suffolk Counties, New York. The parties have stipulated that the aggregate fair market values of eight of these parcels was $ 635,550 on the date of decedent's death. The aggregate values of the other eight parcels remain in dispute. [2] Other assets of Lumber Realty included mortgages and notes receivable ($ 702,945), [3] other receivables ($ 67,568), cash ($ 543,503), and prepaid items ($ 27,505). As of the date of decedent's death Lumber Realty owed the following liabilities: mortgage and notes payable ($ 1,893,217); [4] accounts payable and accrued expenses ($ 113,363) and miscellaneous liabilities ($ 87,818). *715 Lumber Realty's comparative income statement for its taxable years 1966 through 1970 appears as follows: LUMBER REALTY CORPORATION
COMPARATIVE INCOME STATEMENT
1966-70
Year Ending December 31,
1966
1967
Operating Revenues: Rental income
$ 121,078
$ 110,632
Interest income
6,964
11,552
Dividend income
6,322
6,322
Total operating revenues
134,364
128,506
Expenses: Interest
62,585
68,144
Depreciation
33,808
29,739
Real estate tax
10,136
12,804
Other
21,974
37,717
Total expenses
128,503
148,404
Other Income (Expense): Profit on installment sales
179,617
Other
200
6,613
Total other income (expense)
200
186,230
Income before taxes
6,061
166,332
Taxes
151
44,843
Net income
5,910
121,489
Dividends
3,434
3,279
Year Ending December 31,
1968
1969
1970
Operating Revenues: Rental income
$ 113,351
$ 118,850
$ 134,381 Interest income
16,839
49,271
81,109 Dividend income
6,322
6,322
6,282 Total operating revenues
136,512
174,443
221,772 Expenses: Interest
60,753
96,857
86,880 Depreciation
23,910
30,714
35,198 Real estate tax
17,990
13,373
6,501 Other
41,401
50,947
60,137 Total expenses
144,054
191,891
188,716 Other Income (Expense): Profit on installment sales
93,935
12,571 Other
67
a 67,468
(186)
Total other income (expense)
94,002
67,468
12,385 Income before taxes
86,460
50,020
45,441 Taxes
25,832
16,423
10,544 Net income
60,628
33,597
34,897 Dividends
3,279
3,279
3,249 *716 Source: Company's financial statements. On the date of the decedent's death Lumber Realty had 5,027 shares of stock issued and outstanding. These shares were held by the decedent (3,133--62 percent), First Folks Corporation (1,457--29 percent) and W. Kirk Downing (hereinafter Downing) (437--9 percent). In February 1971, William H. Van Tuyl purchased 341 shares of Lumber Realty from F. Lawkins, E. Lawkins and J. Lynch for $ 100 per share. [5] These shares were subsequently sold to First Folks Corporation (hereinafter First Folks) or redeemed by Lumber Realty at $ 75 per share on February 23, 1971. Additionally, on or about March 16, 1972, Lumber Realty purchased the 437 shares held by Downing for $ 100 per share. Shortly before the decedent's death Lumber Realty held 12,564 of the 14,160 outstanding shares in Nassau Suffolk Lumber and Supply Corporation (hereinafter NSL), an operator of lumber yards. NSL was Lumber Realty's primary lessee. In February 1971 Lumber Realty sold its entire *717 investment in NSL. It sold 6,250 shares to NSL Management Corporation for $ 250,000 cash and it sold 6,314 shares to NSL for a promissory note in the face amount of $ 252,560. Simultaneously, and as part of the same transaction, Lumber Realty redeemed 1,470 shares of its own stock from William H. Van Tuyl and his wife for $ 110,250 cash, First Folks purchased a total of 297 shares of Lumber Realty from three individuals for $ 75 per share, and First Folks sold its entire interest in NSL (557 shares) for $ 22,280. [6]
First Folks was incorporated in New York state in 1958 to consolidate certain assets of the Folks family, namely stock in Lumber Realty and NSL. Until his death, the decedent was its president, the chairman of its board of directors and solely responsible for its investment policies and operations. On April 12, 1971, there were 127 shares of First Folks stock issued and outstanding, *718 held by members of the Folks family as follows: No. of Shares
Holder
1
Bernice M. Folks
21
Decedent
21
Decedent, as custodian under the
Uniform Gifts to Minors Act,
for Joseph A. Folks, a minor.
21
T. John Folks, III
21
James M. Folks
21
Robert L. Folks
21
William A. and Kathleen M.
(nee Folks) Mullaney
The following legend appeared on each share certificate: RESTRICTIVE LIMITATIONS This Certificate, and the shares of the Corporation which it represents, may not be transferred whether by sale, pledge, mortgage, hypothecation, assignment, bequest, gift, operation of law, or otherwise, to any person other than to the issue of T. John Folks, Jr., or to THE FIRST FOLKS CORPORATION. In the event that there is ever an attempt to transfer this Certificate otherwise than as heretofore authorized, the attempted transfer shall be a nullity, except only that it shall constitute a tender of this Certificate to the Corporation and an offer to sell the shares represented by this Certificate to THE FIRST FOLKS CORPORATION at a price which shall be determined by multiplying the book value per share, as set forth in the most recent annual certified audit *719 of the books and records of the Corporation, by the number of shares represented by this Certificate. The Corporation may accept this offer within thirty (30) days after it is made by the payment of the price as so determined to the owner of record of this Certificate. The making of such payment shall effect a redemption of the stock represented by this Certificate, and shall be so noted on the Stock Transfer Ledger of the Corporation. The Secretary and the President of the Corporation and all other Officers of the Corporation, and the Directors of the Corporation, as they are now constituted, or as they may be constituted at any time in the future, are, in perpetuity, without the power to issue or to authorize the issuance of this Certificate to any person other than to the issue of T. John Folks, Jr. The primary asset of First Folks at the time of decedent's death was its 29-percent interest in Lumber Realty. Additionally, it had other assets worth $ 214,690 and liabilities of $ 174,716. First Folks' comparative income statement for its taxable years 1966 through 1970 indicates the following: FIRST FOLKS CORPORATION COMPARATIVE INCOME STATEMENT
1966-70
Year Ending December 31,
1966
1967
Revenues: Sale of land and buildings
$ 63,500 $ 38,194 Dividends
3,942 4,082 Interest
1,830 1,918 Rent
2,475 1,800 Total revenues
71,747 45,994 Operating Expenses: Cost of land and
buildings sold
54,632 16,989 Depreciation
1,196 862 Real estate taxes
2,286 1,094 Other
2,948 6,490 Total operating expenses
61,062 25,435 Other Income (Expense): Interest paid
(5,214)
(4,397)
Profit on installment sales--prior
years
340 331 Gain (loss) on sale of
securities
Total other income (expense)
(4,874)
(4,066)
Income before taxes
5,811 16,493 Taxes
1,846 Net income
5,811 14,647 *720 Year Ending December 31,
1968
1969
1970
Revenues: Sale of land and buildings
$ 34,112 Dividends
4,240 $ 4,494 $ 4,190 Interest
3,431 6,993 6,174 Rent
1,800 1,800 1,800 Total revenues
43,583 13,287 12,164 Operating Expenses: Cost of land and
buildings sold
16,058 Depreciation
862 1,577 1,526 Real estate taxes
1,503 1,525 1,725 Other
6,044 3,254 1,000 Total operating expenses
24,467 6,356 4,251 Other Income (Expense): Interest paid
(8,730)
(10,682)
(9,027)
Profit on installment
sales--prior years
5,330 5,654 9,134 Gain (loss) on sale of securities
3,978 (7,927)
Total other income (expense)
(3,400)
(1,050)
(7,820)
Income before taxes
15,716 5,881 93 Taxes
2,931 499 Net income
12,785 5,382 93 Source: Company's financial statements.
On or about April 19, 1965, Mary Folks, the decedent's mother, entered into a transaction with First Folks whereby she would transfer certain marketable securities and real estate valued at $ 103,356.25 to that corporation in exchange for the following: (1) the corporation's note *721 or notes for $ 103,356.25 payable without interest at $ 450 per month; (2) assumption of a $ 2,000 debt; (3) the issuance by the corporation of 21 shares of its capital stock to each of Robert Logue Folks and Joseph Anthony Folks, minors, to be held by the decedent as custodian under the New York Uniform Gifts to Minors Act, and that the corporation accept an unenforceable memorandum of debt from each of Robert Loque Folks and Joseph Anthony Folks for $ 5,000; and (4) certain other nonmonetary considerations including transfer restrictions on all outstanding stock. By the date of the decedent's death, Robert Logue Folks held his 21 shares of First Folks stock outright, but Joseph Anthony Folks' shares continued to be held by the decedent as custodian. By a 30-day letter dated September 12, 1977, to the decedent and his widow, the Internal Revenue Service proposed an income tax deficiency of $ 326,544 with respect to their joint Federal income tax return for 1971. A protest with respect to this proposed deficiency was filed on behalf of the decedent and his widow on November 1, 1977. On May 8, 1978, petitioner filed an amended Federal estate tax return with the Internal Revenue *722 Service in Brooklyn, New York, as a protective claim for a reduction in estate tax liability resulting from a possible increase in Federal income tax liability of decedent, including interest thereon, and additional attorneys' fees with respect to the instant litigation. OPINION The primary issue herein is the valuation for estate tax purposes of blocks of stock of two closely held investment corporations, Lumber Realty and First Folks, owned by the decedent on the date of his death.
Section 2031 provides that the value of the gross estate shall include, inter alia, the value of all property owned by the decedent at the time of his death. The standard of valuation is the fair market value of the property, which is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither of whom is under any compulsion to buy or to sell, and both having reasonable knowledge of all relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. Applicable law provides only generalized guidelines for valuation of closely held stock, e.g., section 20.2031-2(f), Estate Tax Regs. Consequently, where, as in this case, the parties are unable to reach *723 agreement as to valuation, we are left to resolve the issue through the necessarily imprecise process of weighing all the facts and circumstances as they appear in the entire record, with due regard to the petitioner's burden of proof, and often with significant emphasis on the reports and testimony of experts. Estate of Piper v. Commissioner,72 T.C. 1062 (1979). 1. Lumber Realty Land
The parties herein agree that the date-of-death fair market value of the decedent's interest in Lumber Realty must be determined by capitalizing that corporation's net asset value and applying appropriate discounts. Respondent has conceded that the net asset value of Lumber Realty, as established by petitioner's expert witness, Harry H. Ness, [7] is correct except as to the valuation of eight parcels of real estate. *724 Both petitioner and respondent offered expert valuations of the real estate owned by Lumber Realty. The eight parcels still in dispute are each income-producing properties and the respective experts valued them with reference to their rental income streams. The principal difference in the valuations was the rates at which income was capitalized. Respondent's expert, Leonard Rodwin, [8] chose to use the direct capitalization of income method and an overall capitalization rate of from 9- to 9-1/2 percent. He equated an investment in the subject real estate to that in the Baa-rated corporate bond average, which at the time of the decedent's death was 8.45 percent, plus 1 percent to reflect the illiquidity of the real estate. *725 The capitalization rate utilized by petitioner's expert, Charles A. Rogers, [9] was comparable to an overall rate of 12 percent. He viewed the appropriate capitalization rate as a function of the mortgage interest rates as of the date of the decedent's death (with a loan to value ratio of 60 percent) plus an appropriate return on equity invested (40 percent of value). At the time of the decedent's death, the mortgage interest rate was approximately nine percent. Because of the risk, nonliquidity and management burdens, Mr. Rogers concluded that a 14 percent return on equity invested was required. (Nine percent safe rate plus five percent for burdens.) Thus, he settled on a composite interest rate of 12 percent. *726 Respondent's expert used the direct capitalization method of valuation, wherein value equals annual net income divided by the capitalization rate. Petitioner's expert used two different methods to reflect variations in the types of leases to which properties were subject. For properties subject to long-term leases (approximately 20 to 30 years) he used the Inwood Annuity Method which analyzes the value of the stream of income for the duration of the lease and the present value of the land at the time the owner regains full control of it (at the end of the lease and renewal options). The present value of the land is determined on the basis of the Market Data Approach to Value (sales of comparable vacant properties). Where land was subject to short-term leases (two to five years), petitioner's expert used the Building Residual Method of Valuation. This method separately considers the return required on the land alone, and the income available for recapture and return on the building alone. This necessitates separate capitalization rates for the land and the buildings. After evaluating each parcel separately, Mr. Rogers applied a blockage discount of 20 percent to the 5 leased *727 lumberyards. He noted that these constituted the largest lumberyard group in Nassau and Suffolk Counties in 1971. He explained the discount as follows: if the five parcels * * * developed and used as lumber yards were to be sold contemporaneously, the total value of the five parcels should be discounted to account for the depressant effect of putting on the market, at one time, five lumber yards which have the same tenant, within the same geographic region, subject to the same economic conditions. It is reasonable that the total value of the block should be discounted by 20% of the total of the values of the five lumber yards. * * * As is commonly the case where valuation is at issue, the parties have relied almost entirely on the reports and testimony of their respective expert witnesses and on discrediting those of their opponents. On the basis of the testimony and reports of the respective experts concerning land value, we adopt those computed by petitioner's expert, Mr. Rogers. First, we note that Mr. Rogers is significantly more qualified than Mr. Rodwin to value properties located in Nassau and Suffolk Counties, New York. For instance, whereas Mr. Rodwin has appraised *728 25 to 30 parcels in that area over the past 15 years, Mr. Rogers has been involved, directly or as a supervisor, in nearly 100,000 appraisals over a similar period in that geographical area. Additionally, although Mr. Rodwin was a licensed real estate broker in New York City from 1958 to 1966, he had never been engaged in the real estate business in Nassau and Suffolk Counties. Mr. Rogers, on the other hand, has been engaged in the management, brokerage, development and appraisal of real estate in Nassau and Suffolk Counties from 1948 to the present. Secondly, Mr. Rodwin's own testimony revealed several shortcomings of his report. Although he stated that it is very important to personally view all of the properties in an appraisal, he did so for only seven of the eight parcels owned by Lumber Realty which remain in dispute. [10] Also, unlike Mr. Rogers who considered over 50 comparable properties to aid his valuation, Mr. Rodwin considered no comparables. Furthermore, respondent's expert witness did not verify the conditions of any of the subject properties as of the time of the decedent's death, but only as of the time of his report (1980). He stated that he was "just guessing" *729 what the conditions of the properties were in 1971. Notwithstanding the credible testimony and documentary evidence offered by another of petitioner's witnesses that McDonald's corporation paid rents on the basis of a 12-percent capitalization rate (rate of return on value for the property owner) and Mr. Rodwin's concessions that fast food restaurants and lumberyards are alternative investments and that McDonald's leases are "good as gold," and thus would have the lowest capitalization rates available, he steadfastly adhered to his position that the less secure leases to which Lumber Realty's property were subject should be capitalized at only 9- to 9-1/2 percent. Thirdly, we are not persuaded by Mr. Rodwin's choice of a capitalization rate based on rates of return for Baa-rated corporate bonds. After his description of such bonds he merely stated, "An investment in property *730 of a type similar to the subject property is comparable in risk to a Baa-rated bond but less liquid." This is of little assistance to us, however, because he failed to mention any reason for his conclusion of similar risks and we find none readily apparent. Mr. Rogers, on the other hand, arrived at his composite capitalization rate of approximately 12 percent by considering the 9-percent mortgage interest rate necessary to carry 60 percent of the value of the property, as well as a like rate of return (plus 5 percent for the risk, management and non-liquidity burdens) on the equity investment. This analysis clearly contemplates the realistic costs involved in real estate investments which we consider more appropriate than a somewhat oblique reference to corporate bonds. Respondent strongly disputes the accuracy of Mr. Rogers' report on two primary grounds. First, he points out that one of the parcels (Deer Park, which Mr. Rogers valued using a 12-percent capitalization rate, at $ 506,500) was purchased by Lumber Realty less than 4 months prior to the decedent's death for $ 625,000. Mr. Rodwin, using a nine-percent capitalization rate, valued this parcel at $ 634,000. Respondent *731 asserts that because actual contemporaneous sales are the best evidence of fair market value these figures prove Mr. Rogers' valuation far less reliable than that of Mr. Rodwin. There is no dispute that contemporaneous sales of property, between parties with adverse economic interests, which is the subject of a valuation dispute, are generally the best evidence of true fair market value. Narver v. Commissioner,75 T.C. 53 (1980). The concept of purchase price, however, may go beyond the principal amount paid, or to be paid, for property. Fluctuations in principal amount may occur as a result of other terms of sale, as well as other related factors. Lumber Realty purchased the Deer Park property on December 28, 1970. This acquisition was precipitated by the condemnation of another property requiring reinvestment not later than December 31, 1970, to avoid adverse income tax consequences. Sec. 1033(a)(2). The regulations under section 2031 clearly recognize that fair market value is not determined by a forced sale price. Sec. 20.2031-1(b), Estate Tax Regs. We believe the same rule should apply with respect to a forced purchase price. Moreover, the financing *732 arrangements were unusually attractive, both from the standpoint of below market interest rates, due to an assumable six-percent mortgage and because the seller provided Lumber Realty with a substantial purchase money second mortgage. Lumber Realty's equity investment was originally $ 175,000. Respondent's expert, Mr. Delalio, who was involved in the purchase of the Deer Park property, testified that an investor would pay a premium for such favorable financing arrangements because with the reduced equity investment plus lower interest costs a very favorable return on investment was possible notwithstanding an inflated purchase price. Because of Lumber Realty's need to purchase replacement property quickly and the highly favorable financing arrangement involved, Mr. Rogers chose to disregard the purchase price of $ 625,000 in valuing the Deer Park property as of the date of decedent's death. We believe that under the unusual facts presented Mr. Rogers was correct--that the $ 625,000 purchase price of the Deer Park property did not reflect its true fair market value. Respondent also takes exception to the 20-percent blockage discount applied by Mr. Rogers to the 5 leased lumberyard *733 properties. Respondent notes, and Mr. Rogers admitted, that no real estate valuation treatise of which he was aware considered blockage as a valuation factor. Further, Mr. Rodwin testified that in his opinion to place 5 or 50 such properties on the market at one time would not have a depressant effect on prices. Petitioner relies on Mr. Rogers' statement in his appraisal, that there would be a significant "depressant effect of putting on the market, at one time, five lumberyards which have the same tenant, within the same geographic region, subject to the same economic conditions." Under other circumstances respondent's objections would be very weighty indeed. However, after thorough consideration of this point, we accept Mr. Rogers' application of a 20-percent discount to the 5 lumberyard properties. First, Mr. Rogers' uniquely complete expertise in the valuation of real estate in Nassau and Suffolk Counties lends much credibility to his position. Second, at the date of the decedent's death, Lumber Realty owned the largest single group of lumberyards in that area. Third, the improvements situated on the lumberyards in issue are single use in nature and not readily convertible *734 for use in other businesses. This is very important when one considers that the value of the lumberyard buildings is higher relative to the total value of the property than the other improved parcels at issue herein. Additionally, financial difficulties by NSL, the tenant at each lumberyard, could have a devastating effect creating a glut of vacant lumberyards, thereby depressing rentals. Furthermore, although blockage discounts for real estate valuation may not be commonly applied, that does not mean that they are never to be applied. In simplistic terms, blockage refers to an immediate oversupply of goods which demand (the market) will not absorb at optimum prices. It is not unreasonable that placing 5 lumberyards on the market simultaneously in a limited geographical area would depress prices 20 percent. 2. Lumber Realty Stock
Having determined the net asset value of Lumber Realty, we must next consider the fair market value of the Lumber Realty stock held by petitioner and First Folks. The parties are in agreement that the value of Lumber Realty stock should be calculated with reference to that corporation's net asset value. [11] They disagree, however, on what, *735 if any, discounts from net asset value should be allowed. Although respondent's expert, John A. Carrick, [12] discounted the net asset value of Lumber Realty stock held by petitioner, respondent maintains that petitioner is entitled to no discount whatsoever. Petitioner relies entirely on the report of his expert, Harry Ness, [13] for the proposition that the net asset value of Lumber Realty stock held by petitioner must be discounted by 50 percent to correctly reflect fair market value. Mr. Ness used an investment company approach to value the Lumber Realty *736 stock. This approach required a study of the discounts applied to net asset value of minority blocks of freely and actively traded stock of nonregulated investment companies. He found that such discounts ranged from 52.5 percent to 14.8 percent, with the median at approximately 40 percent. Further, Mr. Ness found that an additional discount of 35 percent would normally apply to a minority block to account for lack of marketability since Lumber Realty was not freely and actively traded. Finally, he noted that because petitioner owns a controlling interest in Lumber Realty, a possible premium could apply. Mr. Ness concluded that an investment company discount from net asset value of 50 percent should apply to petitioner's 3,133 shares of Lumber Realty. In arriving at this figure he specifically considered the following factors: illiquidity of assets; $ 750,000 of demand notes payable; significant contingent tax liabilities; $ 492,945 of notes receivable from NSL which leased 5 parcels of Lumber Realty's land valued at $ 802,000; low interest rates on notes receivable from NSL; below median net income on net asset value for investment companies; the effect of the loss of the decedent *737 who had been responsible for investment policy and operations of the company; and the small size of Lumber Realty relative to other investment companies studied. No further discount for lack of marketability or premium for control was contemplated by Mr. Ness because he concluded that these factors effectively canceled each other out. With respect to the Lumber Realty stock owned by First Folks, Mr. Ness applied a 50-percent investment company discount for the same reasons outlined above for such stock owned by petitioner. Additionally, he applied a 35-percent discount for marketability since First Folks' block of Lumber Realty was a minority interest and not freely traded. As respondent accepted Mr. Ness' valuation of the net assets of Lumber Realty (but for the disputed land values), Mr. Carrick's report dealt only with the appropriate discounts to apply to arrive at fair market value. He concluded that an 18-percent marketability discount should be applied to Lumber Realty stock held by petitioner, and that a similar 35-percent discount should be applied to such stock owned by First Folks. Both his report and testimony, however, revealed that the basis for his conclusions *738 was unconfirmed "second hand" information, relayed to him by a person he believed had "interviewed someone named Helmsley Spear." In fact Helmsley Spear is not a person, but a real estate management corporation in New York State. Furthermore, Mr. Carrick's report is incomprehensible as to the reasons for the marketability discounts which he chose. His testimony did not clarify the report, but actually enunciated its deficiencies. On the basis of the reports of their respective experts, we find that the valuation approach and resulting discounts applied by petitioner to the net asset value of Lumber Realty are more nearly correct. See Estate of Piper v. Commissioner,72 T.C. 1062 (1979). We do however attach more weight and importance to petitioner's ownership of a controlling interest in Lumber Realty, and hold that an investment company discount of only 40 percent (rather than 50 percent) applies to petitioner's 3,133 shares of that corporation and also to the 1,457 shares thereof held by First Folks. We find ourselves unable to give much weight to Mr. Carrick's report due to its obvious deficiencies, especially in light of the vastly superior product of Mr. *739 Ness. Consequently, we hold that the conclusions computed in Mr. Ness' report (with the one adjustment we have made) are correct. [14]
3. First Folks Stock
With the value of the Lumber Realty stock owned by First Folks determined, we are able to consider the fair market value of the First Folks stock held by petitioner. Once again, the parties have agreed that the fair market value of the stock must be calculated with reference to the net asset value of the corporation. Also, respondent has agreed with Mr. Ness' conclusion of net asset value for First Folks (but for the value of the Lumber Realty stock). Thus, the only disagreement between the parties is the appropriate discounts, if any, to be applied to net asset value to arrive at fair market value of petitioner's ownership interest. Mr. Ness, petitioner's expert, using the same rationale employed to value Lumber Realty, *740 concluded that an investment company discount of 50 percent should be applied to petitioner's 21 shares of First Folks. He specifically considered the following factors: illiquidity of assets; 42 percent of total assets were invested in a minority interest in Lumber Realty; significant contingent tax liabilities; substantial decreases in profits between 1968 and 1970; no dividends had ever been paid shareholders; and the loss of the decedent who had been solely responsible for investment policy and operations of the corporation. Mr. Ness also applied a marketability discount of 50 percent because petitioner held a minority interest in First Folks, it was not publicly traded, and because the stock was severely restricted. Any attempted transfer of stock to other than the decedent's issue or First Folks itself would be a nullity. Further, First Folks was not obligated to purchase at any price. Respondent's expert, Mr. Carrick, concluded that only a 35-percent marketability discount should be applied to petitioner's stock ownership of First Folks.The basis for his conclusion was identical to that in his valuation of Lumber Realty, thus his report contained the identical deficiencies. *741 We find that the discounts as concluded by Mr. Ness are in fact correct. Although at first blush consecutive discounts may seem extreme, it must be remembered that for all reasonable purposes only First Folks or the decedent's issue are potential buyers of the stock who could enjoy the benefits of ownership due to the restrictive limitations. Consequently, the buyers effectively control the market value. 4. Section 2038 Issues
Respondent has determined that the 21 shares of First Folks held by the decedent as a custodian for his minor son, Joseph A. Folks, under the New York Uniform Gifts to Minors Act [15] are includable in his gross estate pursuant to section 2038(a)(1). [16]
*742 For assets to be includable under section 2038(a)(1) the decedent must have transferred property without adequate and full consideration during his lifetime and, at the date of his death, had the power to "alter, revoke, amend or terminate" the enjoyment thereof. Respondent relies on those cases wherein this Court has held that a transferor-parent custodian under the Uniform Gifts to Minors Act, who dies while the custodianship is still in effect, possesses sufficient powers at his death to require inclusion in the gross estate of the assets so transferred. Estate of Prudowsky v. Commissioner,55 T.C. 890 (1971), and cases cited therein.
Petitioner does not dispute the correctness of the principle relied on by respondent, but argues that to no extent was the decedent the transferor of First Folks stock to his son, Joseph A. Folks. Thus petitioner maintains that section 2038 is not applicable because that section's basic requirement--that there be a transfer by the decedent--was not met. We agree. Immediately prior to the issuance of First Folks stock held by the decedent for Joseph A. Folks there were 85 shares outstanding of which the decedent held 21. *743 Additionally, he was less than a 25-percent shareholder. By resolution of the board of directors of First Folks, the decedent's mother entered into a transaction with that corporation whereby she transferred land valued at over $ 100,000 to the corporation in exchange, inter alia, for an interest-free note, assumption of a $ 2,000 debt, and the issuance of 21 shares of stock to two of the decedent's sons (with decedent as custodian) who were required to issue unenforceable memoranda of debt in the amount of $ 5,000 each. We are not persuaded by respondent's assertion that under these facts the stock issued to Joseph A. Folks should be attributed to the decedent, who was less than a 25-percent shareholder prior to the issuance of the subject shares. Even if no consideration passed from the recipients to the corporation for the stock, the transfer would, in our view, have been in fact a constructive transfer from Mary Folks, the decedent's mother, not the decedent himself. She is the one who required the issuance of stock as part consideration for her transfer of land to First Folks. Thus, the decedent can in no way be considered to have made a transfer of the First Folks stock *744 necessary to require its inclusion in his gross estate pursuant to section 2038. Finally, petitioner has requested this Court to defer entry of its decision under Rule 155 in order to preserve the income tax deficiency proposed against the decedent, and interest thereon, as a deduction in determining the estate tax for which the petitioner is liable. Respondent has no apparent objection to our granting such a request. While we believe that it is not inappropriate for us to grant petitioner's request for the reasons requested, [17] the question has become moot because both parties had made concessions prior to the submission of this matter, which necessitates our entering a decision under Rule 155 notwithstanding. Accordingly, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Inernal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. The petitioner's aggregate asserted value for these properties is $ 1,939,400. Respondent asserts that these properties were worth $ 2,547,842 on the date of the decedent's death. ↩
3. Of the notes receivable $ 492,945 is owed by Nassau Suffolk Lumber & Supply Corporation with interest at a rate of 0.5 percent above the prime commercial loan rate in force in New York City. At the time of the decedent's death the mortgage interest rate was approximately nine percent. ↩
4. Lumber Realty's notes payable included $ 750,000 due to banks on demand.↩
a. Includes $ 64,927 profit on sale of land and building.↩
5. This purchase was motivated by the sellers' dissatisfaction with the manner in which the decedent managed Lumber Realty.↩
6. Lumber Realty reported a long-term capital gain of $ 125,860, and an income tax liability of $ 40,000, arising out of the transactions of February 1971. In 1975 respondent proposed an income tax deficiency against it in the amount of $ 104,741 for 1971 and $ 82,120 for 1972.↩
7. At the time of trial herein, Mr. Ness was vice president of Standard Research Consultants (hereinafter SRC), a firm specializing in the valuation of securities of both publicly owned and closely held corporations. SRC has been in business for over 40 years. Prior to June 1969 it was a wholly owned valuation subsidiary of Standard and Poors Corporation. It is currently a division of the American Appraisal Associates, Inc. Mr. Ness is a graduate of the University of Rhode Island (B.S.; Industrial Management), and New York University, Graduate School of Business (M.B.A.; Banking and Finance-Investments). He is a senior member of the American Society of Appraisers and a member of the National Association of Accountants, National Association of Business Economists, The New York Society of Security Analysts, Inc., and The Canadian Association of Business Valuators. He has been appointed to the panel of arbitrators of the American Arbitration Association. He also teaches a course at New York University School of Continuing Education entitled "Valuing the Going Concern," and he periodically discusses valuation concepts in seminars and professional publications.↩
8. At the time of trial herein Mr. Rodwin was a full-time real estate appraiser for the IRS. Prior to his employment with the Government in 1966 he was a licensed real estate broker in New York State for eight years. He holds a bachelor's degree from Syracuse University and has taken two appraisal courses at the Appraisal Institute. Additionally, he has taught the IRS Appraisal Course for State Tax Returns. For a period of 15 years prior to trial Mr. Rodwin conducted 25-30 appraisals in Nassau and Suffolk Counties. He conducted two of these appraisals (involving three to four parcels of land) since 1969.↩
9. Mr. Rogers has studied economics at Hofstra Law School. Additionally, he completed four courses given by the American Institute of Real Estate Appraisers and two courses given by the Society of Real Estate Appraisers. Additionally, he has taught appraisal courses sponsored by the Society of Real Estate Appraisers. Since 1948 he has been employed in management, brokerage, and appraisal of real estate (self-employed since 1953). He has also sold, built, and developed property as a principal and a partner in real estate development partnerships and corporations. His real estate appraisal experience in the New York City area, and in particular Nassau and Suffolk Counties, is extensive, often at the request of villages, townships, the counties of Nassau and Suffolk, local and New York City banks and insurance companies. He has supervised the appraisal of over 90,000 tax items in the township of Islip with a total value in excess of one billion dollars. His office appraises from several hundred to thousands of pieces of property in the Long Island area each year.↩
10. Of the eight parcels to which the parties have stipulated values, Mr. Rodwin had viewed only four at the time of his report. At that time the parties had not yet stipulated values for these parcels. Thus, of the 16 parcels which Mr. Rodwin believed were in dispute, he had personally viewed only 11.↩
11. Petitioner also concedes that although the few scattered market transactions in Lumber Realty stock cannot be relied on alone to prove value of that stock at the decedent's death, these sales are evidence that the value concluded by petitioner's expert, Mr. Ness, is correct.↩
12. Mr. Carrick is an attorney and a financial analyst for the Internal Revenue Service. He has been involved in the valuation of closely held securities since 1969. From 1962-1968 he worked as a financial analyst for the Securities and Exchange Commission and the Union Trust Company, Washington, D.C.↩
13. See footnote 7, supra.↩
14. We note that the value of Lumber Realty stock held by decedent and First Folks, as calculated by Mr. Ness ($ 161 per share and $ 105 per share, respectively), substantially exceeds the sale price of those shares ($ 75 and $ 100) in contemporaneous, albeit scattered, market transactions.↩
15. New York Personal Property Law sec. 265-275 (current version at New York Estates, Powers, and Trusts Law, secs. 7-4.1--7.4.10↩ (McKinney 1967)). 16. SEC. 2038. REVOCABLE TRANSFERS. (a) In General.--The value of the gross estate shall include the value of all property-- (1) Transfers After June 22, 1936.--To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.↩
17. See Broadhead Trust v. Commissioner,T.C. Memo. 1972-196↩.